[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 6, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11777

_____

D. C. Docket No. 06-00487-CV-MHS-1

JARRON DRAPER,

                                               Plaintiff-Appellee,

versus

ATLANTA INDEPENDENT SCHOOL SYSTEM,

                                               Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(March 6, 2008)**

Before HULL and PRYOR, Circuit Judges, and MOORE[*], District Judge.

---

[*]Honorable K. Michael Moore, United States District Judge for the Southern
District of Florida, sitting by designation.

PRYOR, Circuit Judge:

The issue in this appeal is whether the district court abused its discretion when it awarded a student who is disabled placement in a private school as compensation for violations of the Individuals with Disabilities Education Act. 20 U.S.C. §§ 1400–1482. Jarron Draper entered the Atlanta Independent School System as a student in the second grade. After years of conflict with the School System, Draper's family requested and received an administrative hearing about his education. By then, Draper was 18 years old and in the eleventh grade, but he could read at only a third-grade level. The administrative law judge entered extensive findings and awarded Draper relief, and the district court, after both parties sought review, adopted the findings and increased the award. Draper is now 21 years old. The School System concedes that it violated some of Draper's rights and, in one year, provided him a deficient educational program, but the School System argues that other violations are either barred by the statute of limitations or not supported by the record. The School System also contends that Draper must be educated in a public school and that Draper's award is disproportionate to the violations of his rights. This appeal reminds us of words written by the late Judge John Minor Wisdom about a denial of educational opportunity in a different era: "A man should be able to find an education by

2

taking the broad highway.  He should not have to take by-roads through the woods and follow winding trails through sharp thickets, in constant tension because of the pitfalls and traps, and, after years of effort, perhaps attain the threshold of his goal when he is past caring about it."  Meredith v. Fair, 298 F.2d 696, 703 (5th Cir. 1962).  Because the district court did not abuse its broad discretion to fashion appropriate relief under the Act, we affirm.

## I. BACKGROUND

Before we address the merits of the arguments of the School System, we review three matters.  First, we provide a brief overview of the Act to place the factual record in context.  Next, we review the factual record about the education of Draper by the School System.  Finally, we review the decisions of both the district court and the administrative law judge.

### A. The Individuals with Disabilities Education Act

The Act provides federal assistance to states that provide a free and appropriate education to children with disabilities.  20 U.S.C. § 1412(a)(1)(A). States are required to identify children in need of special education services.  Id. § 1412(a)(3)(A).  After a child is identified as disabled, the state must develop, review, and revise an "individualized education program" that meets the requirements of the Act.  Id. § 1412(a)(4).  A team that includes, at a minimum, the

3

parents of the child, one regular-education teacher of the child, one special-education teacher of the child, and a representative of the local educational agency develops the educational program.  Id. § 1414(d)(1)(B), (d)(3)(A).  The program must comply with the procedures of the Act and be "reasonably calculated to enable the child to receive educational benefits."  JSK ex. rel. JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1571 (11th Cir. 1991) (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 3051 (1982)).

If the parents either disagree with the educational program or believe that the child has been denied rights under the Act, they are entitled to a hearing "conducted by the State educational agency or by the local educational agency" as determined by state law.  20 U.S.C. § 1415(f)(1)(A).  Georgia law provides that the hearings are to be conducted by the Office of State Administrative Hearings.  Ga. Code Ann. § 50-13-41(a)(1).  If either party is aggrieved by the decision of the state educational agency, the party can file a civil action "in a district court of the United States."  20 U.S.C. § 1415(i)(2)(A).

The Act directs the district court to base its decision on a preponderance of the evidence and to "grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  "This Circuit has held compensatory education

appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]." Todd D. ex rel. Robert D. v. Andrews, 933 F.2d 1576, 1584 (11th Cir. 1991) (citing Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir. 1988)). Compensatory education provides services "prospectively to compensate for a past deficient program." G ex. rel. RG v. Fort Bragg Dependent Sch., 343 F.3d 295, 308 (4th Cir. 2003).

*B. Factual Background*

Draper entered the School System as a seven-year-old child in the second grade in 1994. He could not read, was writing at a kindergarten level, and did not know the sounds of the alphabet. Draper's teachers recommended that Draper be tested to determine the cause of his academic struggles in February 1995, November 1996, February 1997, and October 1997.

The School System performed an evaluation of Draper on June 1, 1998, and concluded that he had an intelligence quotient of 63. This evaluation was flawed because it failed to assess Draper for a specific learning disability even though he displayed signs of dyslexia, such as writing letters, numbers, and words backwards. Draper was 11 years old.

On January 25, 1999, Draper was placed in the most restrictive educational environment available, a self-contained classroom for children with mild intellectual disabilities. The restrictive classroom provided Draper with a functional curriculum that would not lead to a regular high school diploma. Draper's team met on April 19, 2000, and determined that he was reading at a third-grade level and spelling at a first-grade level. Draper was 13 years old. Draper remained in the restrictive classroom through the school year of 2002–03. His placement in the restrictive classroom between 1999 and 2003 was based on the 1998 evaluation.

Draper was not reevaluated until April 2003, when he was in the ninth grade and 16 years old. Under the Act, Draper should have been reevaluated by June 2001. 20 U.S.C. § 1414(a)(2)(B)(ii). After completing the evaluation, the school psychologist recommended further testing because discrepancies in subtest scores suggested that the evaluation did not accurately reflect Draper's intellectual potential.

The School System reevaluated Draper in July 2003. This evaluation revealed that Draper did not have mild intellectual disabilities but had a specific learning disability. The evaluation established that a full-scale intelligence quotient of 82, which is in the low-average range of intelligence, more accurately

6

reflected Draper's intelligence. The evaluation also established that Draper was still reading at a third-grade level, performing at a third-grade level in arithmetic, and performing at a second-grade level in spelling. His reading level had not improved since April 2000.

Draper's team met several times throughout the summer and fall to modify his educational program. Draper's family made it clear to the School System that Draper wanted to receive a regular high school diploma so that he could go to college. On August 3, 2003, Draper's family requested private schooling and one-on-one tutoring to help Draper close the achievement gap in his studies. No action was taken on these requests.

On September 9, 2003, the School System modified Draper's diagnosis from mild intellectual disabilities to specific learning disability. Draper's team recommended only 1.5 hours of speech tutoring a week. On October 7, 2003, Draper's team amended the educational program to provide Draper with 19.5 hours of general education and 10.5 hours of special education a week. The School System placed Draper in regular-education classes for the first time since third grade even though a witness for the School System testified that a fifth-grade or sixth-grade reading level is required to survive academically in high school.

Draper's educational program provided that he would use the Lexia program, an instructional computer program, to improve his ability to read, but Draper was not provided the Lexia program. On November 17, 2003, the School System agreed, after mediation, to provide Draper with the Lexia program by no later than November 21, 2003. Despite the agreement, the School System did not implement the Lexia program until December 9, 2003, and, by January 12, 2004, Draper had received only 2.5 hours of instruction with the Lexia program.

On May 24, 2004, Draper was privately evaluated by the Lindamood-Bell reading program. The Lindamood-Bell Center recommended that Draper receive intensive sensory-cognitive training at a rate of 6 hours daily for a total of 360 hours. On May 26, 2004, although the School System was aware that Draper was still reading at a third grade level, Draper's team decided that he would use the Lexia program for the summer. Draper's family requested private reading services but were informed that they would have to file a formal complaint to pursue the matter.

During the summer of 2004, the School System referred Draper to Dr. Judy Wolman for an independent psychological evaluation. The evaluation established that Draper's skills in several areas were severely discrepant from his potential. Dr. Wolman concluded that Draper suffered from a specific learning disability

consistent with dyslexia and recommended "intensive multi-sensory training" to remedy his academic deficits. Despite Draper's family's objections that the Lexia program was inadequate to address Draper's needs, Draper's team decided on November 18, 2004, to continue the use of the Lexia program. When Draper's team met again on May 12, 2005, Draper had failed his language-arts class and was failing the second semester of algebra.

On September 10, 2004, the Georgia Department of Education acknowledged that Draper's grades had not improved. The Department informed Draper's family that they could request a hearing if they were not satisfied with Draper's educational program. The hearing was conducted by the administrative law judge in November 2005. By then, Draper was 18 years old and in the eleventh grade.

## C. Procedural History

The administrative law judge held a hearing for three days regarding Draper's education. The School System retained an expert, Dr. Barry Bogan, who had never met or spoken with Draper. Cross-examination established that Bogan's assumptions regarding Draper's diagnosis, age, and educational level were incorrect. Bogan was unaware that Draper had been diagnosed as having a specific learning disability. Bogan testified that Draper was 16 or 17 years old when in fact

9

Draper was almost 19 years old. Bogan was of the opinion, based on his review of a single test, that Draper was reading at a sixth-grade or eighth-grade level instead of a third-grade level. Bogan opined that the School System had provided Draper an adequate education.

Draper called several experts to testify on his behalf. Both Dr. Wolman and Camilla Fletcher had spent extensive time with Draper. Wolman testified that Draper did not have the necessary skills to benefit from the Lexia program, and Fletcher testified that the use of the Lexia program for 30 minutes a day was insufficient to remedy Draper's achievement gap. After Dr. Edward Dragan spoke with Draper and reviewed his educational file, Dragan testified that the School System should have discovered that it had misdiagnosed Draper as mildly intellectually disabled much earlier than 2003. Dragan expressed serious doubt that the School System could or would provide Draper the appropriate services to remedy his educational deficits. Wolman and Fletcher both expressed concern about the ability of an expert to evaluate a student's education if the expert had never spoken with the student and was unfamiliar with the student's diagnosis.

Draper testified that the School System did not provide him with Lexia instruction 30 minutes a day for five days a week as the School System had alleged. Draper stated that his tutor, a football coach, spent much of the sessions

10

surfing websites about football on the internet. Draper testified that his science class consisted of coloring and his math class of crossword puzzles. The administrative law judge concluded that Draper was "very articulate" and a "very impressive witness."

The administrative law judge found that the School System failed to provide Draper an adequate education for the school years of 2002–03, 2003–04, and 2004–05. The administrative law judge found that, after the School System misdiagnosed Draper in 1998, the School System failed to reevaluate him, in violation of the Act. The administrative law judge concluded that the use of an educational program that did not increase Draper's reading ability after three years failed to satisfy the Act.

The administrative law judge awarded Draper a choice of two remedial options. The first option provided Draper with substantial additional support services in the School System. The School System would have been required to provide Draper with intensive multi-sensory reading services for 60 minutes a day, five days a week; train all of Draper's teachers in dyslexia instructional strategies; provide Draper with a one-on-one, certified, special-education teacher to support him in all his classes; provide one hour a day of tutorial services; provide services during the summer; and, during the first year, evaluate Draper's progress monthly.

11

The second option allowed Draper to be placed in a private school and required the School System to pay his tuition, not to exceed $15,000 a year. These services were available until June 2009 or when Draper received a high school diploma, whichever came first.

Both parties sought review by the district court. 20 U.S.C. § 1415(i)(2)(A). Draper contended that the administrative law judge provided inadequate compensatory services to remedy the violations of the Act by the School System, and the School System argued that it had not violated the Act. The School System argued that the administrative law judge had disregarded the statute of limitations, made erroneous findings of fact, failed to use the proper standard under the Act, and created a remedy "unauthorized by the law or the evidence."

While the dispute was pending in the district court, Draper selected the second option, the placement in a private school, and requested placement at the Cottage School, but Draper reserved his right to argue that the second option was inadequate. The School System moved to stay the enforcement of the order of the administrative law judge so that the School System would not have to pay for Draper's placement in a private school while the district court reviewed the dispute. The district court denied the motion to stay the enforcement of the award

12

and ruled that Draper's selection of the second option was enforceable while the dispute was pending in the district court.

In its final order, the district court ruled for Draper in part and for the School System in part. The district court concluded that the statute of limitations permitted an award for Draper's placement in the restrictive classroom in 1999 but limited compensation for the failure by the School System to reevaluate Draper for the period between November 2002 and April 2003. The district court agreed with the administrative law judge that the School System failed to provide Draper an adequate education for the school years of 2002–03, 2003–04, and 2004–05. As Draper requested, the district court modified the second option in the award by the administrative law judge. The district court awarded Draper full services at the Cottage School without the $15,000 cap and extended the time frame of the remedy to 2011 or when Draper receives a high school diploma, whichever comes first. The district court found that "there is ample evidence in the record of the types of services [Draper] will require to appropriately educate him within the meaning of the [Act]." The district court concluded that the Cottage School could address Draper's educational needs and was the "appropriate" placement.

## II. STANDARDS OF REVIEW

A few standards govern our review of this appeal. Whether an educational program provided an adequate education under the Act "is a mixed question of law and fact subject to <u>de novo</u> review." <u>CP v. Leon County Sch. Bd. Fla.</u>, 483 F.3d 1151, 1155 (11th Cir. 2007) (citing <u>Sch. Bd. v. K.C.</u>, 285 F.3d 977, 982–83 (11th Cir. 2002)). "Specific findings of fact are reviewed for clear error." <u>Id.</u> (citing <u>K.C.</u>, 285 F.3d at 983). "To the extent that this issue involves the interpretation of a federal statute, it is a question of law which we review <u>de novo</u>." <u>Id.</u> (citing <u>Walker County Sch. Dist. v. Bennett ex rel. Bennett</u>, 203 F.3d 1293, 1295 (11th Cir. 2000)). We review awards under section 1415(i)(2)(B)(iii) of the Act for abuse of discretion. <u>See</u> <u>Bd. of Educ. v. L.M.</u>, 478 F.3d 307, 316 (6th Cir. 2007). If the district court finds a violation of the Act, it "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Act grants "broad discretion" to the district court. <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 369, 105 S. Ct. 1996, 2002 (1985).

## III. DISCUSSION

We evaluate the argument of the School System in two parts. First, we consider whether the district court abused its discretion in the light of the decision

of the administrative law judge. Second, we consider whether Draper's award is disproportionate to the violations of the Act by the School System.

*A. The District Court Did Not Abuse its Discretion in the Light of the Decision of the Administrative Law Judge.*

The School System argues that, even if Draper was entitled to an award, the district court abused its discretion in two ways. First, the School System argues that, because the award by the administrative law judge provided Draper a placement in a public school as one option for compensation, the district court could not award Draper a placement in a private school. Second, the School System contends that Draper's award is contrary to the Act because the administrative law judge granted Draper a unilateral choice regarding his education. These arguments fail.

1. The Provision of a Public School Option by an Administrative Law Judge Does Not Preclude an Award of Placement in a Private School by a District Court.

The School System argues that Draper's award violates the Act as a matter of law because it allows a placement in a private school when the administrative law judge provided the option of a placement in a public school. The School System reads the provision of a public school option by the administrative law judge as a finding that the School System is able to educate Draper adequately. Although we doubt that the decision of the administrative law judge evinced any

15

confidence in the ability of the School System to compensate for its failed attempt to educate Draper, we will assume, for the purpose of this discussion, that the administrative law judge found that the School System could prospectively provide an appropriate educational program for Draper. Even with that assumption, the argument of the School System fails.

The district court was free to fashion appropriate relief for Draper regardless of the options offered in the discussion of the administrative law judge. The Act requires "appropriate" relief, and "the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act." Burlington, 471 U.S. at 369, 105 S. Ct. at 2002. "'[E]quitable considerations are relevant in fashioning relief,' Burlington, 471 U.S., at 374, 105 S. Ct., at 2005, and the court enjoys 'broad discretion' in so doing, id., at 369, 105 S. Ct., at 2002." Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 16, 114 S. Ct. 361, 366 (1993). "This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by [the Act]." Andrews, 933 F.2d at 1584 (citing Breen, 853 F.2d at 857).

The district court did not find that the School System could afford Draper appropriate relief. The district court, unlike the administrative law judge, did not

16

award Draper a placement in a public school as one option for compensation. The district court awarded Draper placement in a private school.

The School System argues that a purpose of the Act, which is to make public schools the preferred setting, precludes Draper's award of placement in a private school, but we disagree. The Supreme Court has explained, "[T]he Act contemplates that such education will be provided where possible in regular public schools . . . , but the Act also provides for placement in private schools at public expense where this is not possible." Burlington, 471 U.S. at 369, 105 S. Ct. at 2002–03. We have recognized that the Act "reflects a structural preference in favor of providing special education in public schools," but we have explained that when a public school fails to provide an adequate education in a timely manner a placement in a private school may be appropriate. Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312 (11th Cir. 2003).

A prospective injunction that requires a placement in a private school is appropriate "beyond cavil" when an educational program "calling for placement in a public school [is] inappropriate." Burlington, 471 U.S. at 370, 105 S. Ct. at 2002. "[A] disabled student is not required to demonstrate that he cannot be educated in a public setting. Under [the Act], the relevant question is not whether a student could in theory receive an appropriate education in a public setting but

whether he will receive such an education." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 248–49 (3d Cir. 1999).

It is well settled that an award of reimbursement for the expenses of a private school is allowed under the Act when the private placement is appropriate for the student and an educational program at a public school has been inadequate. Burlington, 471 U.S. at 370, 105 S. Ct. at 2002–03.  In Burlington, the student's father unilaterally removed the student from the public school and placed the student in a private school because the father believed that the educational program offered by the public school was inadequate. Id. at 362, 105 S. Ct. at 1999.   The Supreme Court held that a prospective injunction providing placement in a private school would be appropriate, as would reimbursement for those expenses. Id. at 370, 105 S. Ct. at 2003.  The Court reasoned that, because of the inevitable elapse of time during the litigation, a determination that a public school system violated the Act would be an "empty victory" if reimbursement for the expenses of a private education were unavailable. Id.  Similarly, in Florence County, after the local and state agencies rejected the parents' complaints about an educational program, the parents unilaterally placed the student in a private school.  510 U.S. at 10, 114 S. Ct. at 363–64.  The Supreme Court affirmed the award of reimbursement because

18

the educational program offered by the public school was inadequate and the placement in a private school was appropriate. Id. at 12–15, 114 S. Ct. at 364–66.

The School System argues that Draper's award is different from an award of reimbursement, but reading "appropriate" as requiring prospective placement in a public school, as the School System argues, would create an anomaly in the law. If Draper's family had unilaterally placed him in the Cottage School, then an award of reimbursement would be appropriate under the Act. See Burlington, 471 U.S. at 370, 105 S. Ct. at 2003. The district court found that the School System had failed to provide Draper an adequate educational program, and the district court concluded that the Cottage School offered an appropriate placement. If the district court could not prospectively award Draper a placement in a private school, Draper would be worse off with an award of prospective education than he would be with a retroactive award of reimbursement for the same violations of the Act. The Supreme Court has recognized that "conscientious parents who have adequate means" will place their child in private school if they are "reasonably confident of their assessment" that an educational program at a public school is inadequate. Id. at 370, 105 S. Ct. at 2003. The argument of the School System would provide those wealthier parents greater benefits under the Act than poorer parents.

We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement. The Act does not relegate families who lack the resources to place their children unilaterally in private schools to shouldering the burden of proving that the public school cannot adequately educate their child before those parents can obtain a placement in a private school. The Act instead empowers the district court to use broad discretion to fashion appropriate equitable relief.

The argument of the School System is wrong. Although it ordinarily has a structural preference for special education in public schools, the Act does not foreclose a compensatory award of placement in a private school. The district court was free to award Draper a placement in a private school without regard to the remedy fashioned by the administrative law judge, and Draper was not required to prove that the School System was incapable of providing him an appropriate education.

2. The Provision of Two Options for Draper by the Administrative Law Judge Does Not Affect the Validity of the Award by the District Court.

The School System also contends that Draper's award violates the Act because the administrative law judge provided Draper a unilateral choice between two options. The School System argues that Draper's award is inconsistent with "the cooperative process that [the Act] establishes between parents and schools."

20

<u>Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 53, 126 S. Ct. 528, 532 (2005).

We disagree.

The argument of the School System is based on the erroneous premise that the district court, like the administrative law judge, awarded Draper two options for compensation when, in fact, the district court awarded Draper placement in only a private school. Whatever two options the administrative law judge awarded Draper is beside the point. We review the decision of the district court, and that decision awarded Draper his preferred form of compensation.

The School System contends that the district court left the provision of two options in Draper's award intact, but we read the record differently. Before the district court modified and supplemented Draper's award, Draper selected the second option in that award, which was placement in a private school. The School System moved to stay the enforcement of the award so that it would not have to pay for Draper's placement in a private school, but the district court denied that motion. The district court ruled that Draper's selection of the second option was enforceable. When the district court, in its final order, granted Draper's request to increase his award, the first option was no longer viable. Draper had already rejected that option.

In its final order, the district court awarded relief to supplement the option that Draper had already selected. The district court unequivocally found that the second option, with the supplements sought by Draper, would provide the appropriate relief under the Act: "In exercising its discretion to grant such relief as the Court deems appropriate, the Court finds that [Draper] is entitled to the full services at The Cottage School including the supplemental services as outlined by Dr. Digieso in her affidavit. [The School System] shall pay for these services in full at a total cost of $34,150.00 a year." The district court did not leave the first option intact as the School System contends.

Even if we assume that the district court left the first option intact, the argument of the School System still fails. Parents have a right, under the Act, to make some unilateral decisions concerning their child's education after a school system has violated the Act. In Florence County, the Supreme Court, for example, reaffirmed the parental "right of unilateral withdrawal recognized in Burlington." Florence County, 510 U.S. at 13, 114 S. Ct. at 365. The cooperative process established by the Act between parents and schools does not bar district courts from providing parents appropriate relief that includes a unilateral choice regarding their child's education.

22

*B. The District Court Did Not Abuse Its Discretion and Enter a Disproportionate Remedy.*

The School System argues that the district court abused its discretion in three ways: (1) the district court erroneously based its decision on Draper's misdiagnosis and placement in the restrictive classroom in 1998; (2) the award was a disproportionate remedy for the violations of the Act by the School System; and (3) the award constituted impermissible punitive damages. The first two arguments implicate findings of fact by the district court, which we review for clear error. We reject the arguments of the School System.

1. The District Court Did Not Abuse Its Discretion When It Considered Draper's Misdiagnosis in 1998 and His Placement in the Restrictive Classroom Between 1999 and 2003.

The School System presents two arguments about Draper's misdiagnosis. The School System contends that Draper was not misdiagnosed in 1998 but that, if he was misdiagnosed, Draper's complaint about his placement in the restrictive classroom between 1999 and 2003 is barred by the statute of limitations. We disagree on both points.

The School System contends that "there is no undisputed record evidence" of Draper's misdiagnosis, but that is not the issue. What matters is that there is substantial evidence to support the finding of the administrative law judge that

23

Draper was misdiagnosed in 1998, and the acceptance of this factual finding by the district court was not clearly erroneous.

The administrative law judge relied on substantial evidence that the evaluation of Draper in 1998 was far from the comprehensive evaluation that was supposed to be administered. The administrative law judge found as follows that the limited evaluation failed to measure key aspects of Draper's abilities:

> Given that [Draper] had been observed writing words, letters, and numbers backwards, a classic symptom of dyslexia, and that he performed much better on verbal tasks, the evaluation performed in June 1998 was spectacularly deficient. The evaluation did not measure [Draper's] phonological processing levels (which are essential to reading) nor did the evaluator review [Draper's] receptive and expressive levels. Based on the limited evaluation performed, which essentially included an I.Q. test, the school psychologist concluded that [Draper] had a full scale I.Q. of 63.

The persistent refusal of the School System to acknowledge the substantial evidence of its misdiagnosis borders on incredible.

The district court also did not err in finding that the misplacement of Draper in the restrictive classroom between 1999 and 2002 is not barred by the statute of limitations. The Act requires parents to request a due process hearing "within 2 years of the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). Draper filed his complaint in November 2004. The district court found that Draper's

24

family did not have the facts necessary to know that Draper had been injured by his misdiagnosis and misplacement until they received the results of his evaluation in 2003.

The argument of the School System rests on the dubious proposition that Draper's family should have known that Draper had been misdiagnosed and misplaced even before the School System informed Draper's family that it had reached that conclusion. The School System argues, for example, that because the administrative law judge found it "incredulous" that anyone would consider Draper mentally retarded in 2003, Draper's family should have been "intimately aware of the particular nature—if not the precise medical classification—of his disability." The School System contends that the district court clearly erred because Draper's family should have known something that the trained professionals of the School System did not admit they knew.

This argument fails. Substantial evidence supports the finding that, until 2003, Draper's family did not know enough to realize that Draper had been injured by his misdiagnosis and misplacement by the School System. We decline the invitation of the School System to conclude, as a matter of law, that Draper's family should be blamed for not being experts about learning disabilities. The observation by the administrative law judge was a statement about an obvious

25

failure by the School System, not a statement about a misdiagnosis by Draper's family. The district court did not clearly err by adopting the finding that Draper's family did not have reason to know of Draper's injury until 2003.

2. Draper's Award Is Not Disproportionate to the Violation by the School System.

The School System contends that Draper's award is disproportionate to the violations by the School System. The School System does not contest that it failed to provide Draper an adequate education for the school year of 2002–03, but instead challenges the findings of the administrative law judge and the district court that the School System failed to provide Draper an adequate education in the school years of 2003–04 and 2004–05. The School System contends that it provided Draper with an adequate program in reading in those years.

In our review of Draper's award, we are mindful that an award of compensation for a violation of the Act is different from the educational program ordinarily required by the Act. An educational program must be "reasonably calculated to enable the child to receive educational benefits." JSK, 941 F.2d at 1571 (quoting Rowley, 458 U.S. at 206–07, 102 S. Ct. at 3051). "[W]hen measuring whether a handicapped child has received [adequate] educational benefits . . . courts must only determine whether the child has received the basic floor of opportunity." Id. at 1572–73 (citing Andrews, 933 F.2d at 1580). If there

26

has been a violation, the district court may award "appropriate" compensatory relief. 20 U.S.C. § 1415(i)(2)(C)(iii); Andrews, 933 F.2d at 1584. Although "ordinary [educational programs] need only provide 'some benefit,' compensatory awards must do more—they must compensate." Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 525 (D.C. Cir. 2005). Compensatory awards should place children in the position they would have been in but for the violation of the Act. Id. at 518.

*a. 2003–04*

The School System contends that the district court erred when it found a violation for the school year of 2003–04 based on a disagreement with the use of the Lexia program, but this argument misunderstands the findings of the district court. The use of the Lexia program was one of many deficiencies in Draper's educational program during the school year of 2003–04. In September Draper's program maintained his placement in the restrictive classroom even though the evaluation in July 2003 found that Draper did not have mild intellectual disabilities. After the School System changed Draper's diagnosis, the School System provided Draper with only 1.5 hours of speech tutoring a week. On October 7, 2003, the School System was aware that Draper could read at only a third-grade level and that a fifth-grade or sixth-grade reading level was required to

27

access the curriculum in high school, but the School System placed Draper in regular-education classes. Draper's program stated that the Lexia program would be provided to address his reading deficit, but Draper's family had to file a formal complaint before the School System actually provided the Lexia program. Even after the formal complaint, the School System did not provide Draper with the Lexia program until December 2003, and by January 2004 Draper had received only 2.5 hours of services using the Lexia program. Draper was still reading at a third-grade level at the end of the school year of 2003–04.

Substantial evidence supports the findings of the district court. The School System failed to modify Draper's educational program for several months after testing established that his placement was not appropriate, knowingly placed Draper in classes in which he could not succeed, and failed to address Draper's reading deficiency for half of the school year. The finding that the School System failed to provide Draper an adequate education for the school year of 2003–04 is not clearly erroneous.

### b. 2004–05

The School System argues that the district court, in its finding about the school year of 2004–05, failed to recognize the difficulty of modifying an educational program to address a complex situation. This Court has recognized

that, when a program is revised, "perfection is not required." Loren F., 349 F.3d at 1312 (citing K.C., 285 F.3d at 982). The record reflects that the district court understood this admonition.

The district court did not fault the School System because it failed to be perfect. The district court found that the School System failed to provide Draper with "the basic floor of opportunity." JSK, 941 F.2d at 1573 (citing Andrews, 933 F.2d at 1580). The School System was aware in the summer of 2004 that Draper was still reading at a third-grade level, and the School System was informed that Dr. Wolman recommended "intensive multi-sensory training to bring the deficient skills closer to his potential so that he can ultimately perform independently as an adult." Despite Draper's continued academic stagnation and the recommendation of Dr. Wolman, the School System continued to use the Lexia program over the objection of Draper's family. The district court did not clearly err when it found that the educational program provided by the School System failed to provide Draper with an adequate education for the school year of 2004–05.

### 3. Draper's Award Is Compensatory, Not Punitive.

The School System argues that both the decision of the district court and the earlier findings of the administrative law judge smack of retaliation. The School System complains of "disdainful references" to its witnesses and officials by the

29

administrative law judge, and the School System describes as "caustic" the conclusion of the administrative law judge that the School System had "forfeited its right to continue to 'educate' [Draper]." The School System complains that the district court repeated these allegedly improper comments.

We are not in any position to disturb these findings. Unlike the administrative law judge, we have not observed the parties and witnesses who appeared and testified at Draper's hearings. There is ample evidence to support the administrative law judge's description of Draper's educational experience as a "tragic tale," and there is nothing in this record that suggests to us that the findings adopted by the district court are anything but supported in fact. Although strongly worded, the decisions of both the district court and the administrative law judge are professional and temperate.

In the light of this record, we cannot say that Draper's award was an abuse of discretion. The record supports the conclusion of the district court that Draper's award is "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." Reid, 401 F.3d at 524. We categorically reject the assertion of the School System that Draper's award "looks suspiciously like" an award of punitive damages.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of Draper.

**AFFIRMED.**