[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10123
Non-Argument Calendar
_____

D.C. Docket No. 5:13-cv-01596-CLS

PHYLLENE W.,
individually and as mother and next friend of M.W., a minor,

Plaintiff - Appellant,

versus

HUNTSVILLE CITY BOARD OF EDUCATION,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(October 30, 2015)

Before TJOFLAT, WILSON and ROSENBAUM, Circuit Judges.

PER CURIAM:

Appellant Phyllene W., the mother of a student who received special-education services from Appellee Huntsville City Board of Education (the "Board"), appeals the district court's final judgment in favor of the Board, denying her claims under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* After a thorough review of the briefs and the record, we reverse the judgment of the district court.

## I.

The IDEA was enacted, in part, "to ensure that all children with disabilities have available to them . . . a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. §1400(d). Under the IDEA, state and local educational agencies may receive federal assistance if they have in place policies and procedures designed to ensure that they provide a free appropriate public education ("FAPE")[1] to students

---

[1] The IDEA defines FAPE as special education and services that

    (A) have been provided at public expense, under public supervision and direction, and without charge,

    (B) meet the standards of the state education agency,

    (C) include an appropriate preschool, elementary, or secondary school education in the state involved, and

    (D) are provided in conformity with the individualized education program required by the Act.

2

with disabilities.  *CP v. Leon Cty. Sch. Bd. Florida,* 483 F.3d 1151, 1152 (11th Cir. 2007); 20 U.S.C. § 1412.  Satisfying the IDEA's duty to provide a FAPE requires the state or local educational agency to offer "'personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'"  *CP*, 483 F.3d at 1152 (quoting *Bd. of Educ. of Hendrick Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203, 102 S. Ct. 3034, 3049 (1982)).

Among other things, the IDEA requires schools and parents together to develop an individualized education program ("IEP") that addresses the child's unique needs.  *See RL v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1177 (11th Cir. 2014).  An IEP, in turn, is a

> written statement that describes the child's academic performance and how the child's disability affects her education, states measurable educational goals and special needs of the child, establishes how the child's progress will be measured and reported, and states the services available, based on peer-reviewed research, to enable the child to attain the goals, advance educationally, and participate with disabled and nondisabled children.

*K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.,* 741 F.3d 1195, 1201 (11th Cir. 2013) (citing 20 U.S.C. § 1414(d)(1)(A)(i)).  The IEP is meant to be the "culmination of a collaborative process between parents, teachers, and school administrators,

---

20 U.S.C. § 1401(9).

outlining the student's disability and his educational needs, with the goal of providing the student with a [FAPE]." *RL*, 757 F.3d at 1177.  (citations omitted).

While the IEP should be "reasonably calculated to enable a child to receive educational benefits," *RL*, 757 F.3d at 1177 (citations omitted), the IDEA does not require an IEP to maximize the potential of each child with a disability comparable to the opportunity provided to children without a disability.  *Rowley*, 458 U.S. at 200, 192 S. Ct at 3048.  Nor does the IDEA require an IEP to meet "any particular substantive educational standard."  *Id.*  Instead, the student with a disability must receive "personalized instruction with sufficient support services to permit the child to benefit educationally."  *Id*.  The IDEA requires that the IEP team reviews the IEP at least annually to determine whether the goals of the child are being met.  20 U.S.C. § 1414(d)(4)(A).

If the child's parents are dissatisfied with the IEP and believe that it does not comply with the IDEA's requirements, they may file a complaint with the state administrative agency.  *RL*, 757 F.3d at 1177.  During this process, the parents receive a due-process hearing before an Administrative Law Judge or Hearing Officer to resolve the dispute.  *Id.*; 20 U.S.C. § 1415(f)(1)(A).  If either party disagrees with the outcome of the due-process hearing, that party may appeal the decision by filing suit in state court or in the United States District Court.  *RL*, 757 F.3d at 1178 (citing 20 U.S.C. § 1415(i)(2)(A)).

We use a two-part test to analyze whether a defendant has provided a qualifying FAPE in cases arising under the IDEA: "(1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit." *Sch. Bd. of Collier Cty., Florida v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002) (citing *Rowley*, 458 U.S. at 206-07, 102 S. Ct. at 3051). With respect to the first prong, a procedurally defective IEP does not automatically result in a violation of the IDEA. *G.J. v. Muscogee Cty. Sch. Dist.*, 668 F.3d 1258, 1270 (11th Cir. 2012). Rather, in order to determine whether a procedurally defective IEP has deprived a student of a FAPE, the court must also consider the impact of the defect, which is encompassed in the second prong. *Id.* (citation omitted).[2]

The standard encompassed in the second prong—that of "some educational benefit"—has become known as the *Rowley* "basic floor of opportunity" standard.

---

[2] A procedurally defective IEP violates that IDEA when it:

> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

*T.P. ex rel T.P. v. Bryan Cty. Sch. Dist.*, 792 F.3d 1284, 1293 (11th Cir. 2015) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).

5

*CP*, 483 F.3d at 1153. The IDEA does not require that the educational services offered maximize the child's potential. *Todd D. v. Andrews*, 933 F.2d 1576, 1580 (11th Cir. 1991) (citing *Rowley*, 458 U.S. at 199, 102 S. Ct. at 3048). Rather, the IDEA guarantees the child only education which confers some benefit. *Id.* "If the educational benefits are adequate based on surrounding and supporting facts, [IDEA] requirements have been satisfied." *JSK By and Through JK v. Hendry Cty. Sch. Bd.*, 941 F.2d 1563, 1573 (11th Cir. 1991). Adequacy is determined on a case-by-case basis in light of the child's individual needs. *Id.*

## II.

M.W. was born on March 6, 1997. Appellant Phyllene W. is M.W.'s mother. When M.W. was twenty-one months old, she underwent the first of many surgeries to place tympanostomy tubes in her ears. At that time, audiometric testing revealed that M.W. had mild hearing loss. Before starting kindergarten, M.W. had two additional surgeries to replace the tubes in her ears, and by the time M.W. was sixteen years old, she had undergone seven surgeries to place or replace the tubes in her ears. Over the course of these years, audiometric testing revealed that M.W. had fluctuating hearing loss ranging from slight to moderately severe.

M.W. began kindergarten in the Huntsville City School District during the 2002-2003 school year. From the time that she began attending school, and continuing until her mother withdrew her from public school in tenth grade, M.W.

encountered significant difficulties in the areas of reading and math.  She also experienced problems with her ability to organize her schoolwork and succeed on standardized tests.

Due to M.W.'s difficulties, M.W.'s mother hired a private tutor, who worked to increase M.W.'s reading and math skills after school.  The tutor first met with M.W. twice a week for an hour after school.  But, beginning when M.W. was in second grade, she received tutoring services daily for an hour after school.  Ms. W. provided this tutoring at her own expense from the time M.W. was in second grade and continuing until at least when M.W. withdrew from public school in her tenth-grade year.  Despite daily tutoring, over the years, M.W. was unable to meet Alabama's content standards in the required areas for math and reading.

The Board determined that M.W. qualified for services under the IDEA towards the end of her second-grade year.  Based on her observations of M.W.'s difficulties in the classroom, M.W.'s second-grade teacher recommended that M.W. undergo an evaluation to determine whether she had a learning disability.  At this point, M.W. had already been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  The Board conducted an evaluation of M.W. in March 2005 that included measuring her intelligence, behavior, and abilities in math and reading.  The Board conducted a Stanford Binet I.Q. test and a DAB-3 Diagnostic Achievement Battery.  The I.Q. test revealed that M.W.'s range of

7

intelligence was average, but the achievement test showed that M.W. was functioning below her grade level.   At the same time, the Board tested M.W.'s vision and hearing, both of which fell within normal limits.  Because a discrepancy existed between M.W.'s I.Q. score of 91 and her score on the achievement test, though, M.W. was labeled as having a Specific Learning Disability, which qualified her for special-education services.

Following the evaluation, in April 2005, the Board convened a meeting with Ms. W. to develop an IEP for M.W.'s third-grade year.  The IEP indicated that M.W. was performing at a first-grade level in reading and math and included the following goals:  raising her math and reading levels to the second-grade level by the end of the school year.  In order to accomplish these goals, the Board implemented a plan for M.W. to receive small-group instruction for thirty minutes a day in the school's resource room.

During the summer before third grade, Ms. W. brought M.W. to a private school, where she received assistance in reading and math.  At Ms. W.'s expense, the private school also assessed M.W. and determined that she exhibited the characteristics of dyslexia.  The private school recommended that M.W. receive "direct dyslexia intervention" and "multi-sensory language instruction," and it suggested that M.W. may need additional time taking tests.  Ms. W. provided the Board with these results during an IEP meeting in August of 2005.  Although Ms.

8

W. suggested two computer programs to address M.W.'s dyslexia, the Board did not offer to provide such instruction. The Board did agree, however, to provide M.W. with additional time to take tests and complete writing assignments, and it agreed that M.W.'s teacher would not penalize her for spelling and grammar mistakes. Later that year, the IEP team agreed to allow M.W. to take tests in the resource room where there were fewer distractions.

For the next few years, M.W. received similar special-education services but continued to have difficulty in math and reading—working below grade level. At the end of M.W.'s fifth-grade year, Ms. W. met with the IEP team and informed those in attendance that M.W. suffered from hearing loss. Significantly, the IEP for M.W.'s sixth-grade year reflects that when Ms. W. met with the IEP team, she told them that M.W. had a "history of having tubes in her ears and her hearing in her left ear is worse than it was two years ago." Notes from the IEP also reflect the conversation and add the following: "parents are going to pursue treatment."

But the record does not contain any evidence that demonstrates that the Board followed up with Ms. W. regarding the outcome of any treatment. Nor did the Board schedule an evaluation of M.W.'s hearing following the receipt of this information. The IEP again developed goals in the areas of reading and math, with M.W. working in the resource classroom with a special-education teacher twice a week for an hour on both subjects. M.W. was also to be given preferential seating

in her regular classroom to reduce distractions.  But, the IEP did not address the fact that M.W. might have a hearing impairment, which would qualify her for separate services under the IDEA.

M.W.'s triennial reevaluation was due at the same time that her sixth-grade IEP was developed.  The IEP team, however, recommended that M.W. not be reevaluated at the time because they suggested that she might "test out" of special-education services.  Ms. W. accepted the Board's recommendation, and M.W. was promoted to sixth grade still eligible for special-education services.

Over her the next few years, M.W. continued to receive private tutoring and special-education services relating to her Special Learning Disability, but the Board did not test her hearing, despite the fact that she underwent additional surgeries to replace the tympanostomy tubes in her ears.  M.W. was also promoted from grade to grade despite failing to meet the content standards on the Alabama Reading and Math Test ("ARMT") in the sixth and seventh grades.  Similarly, an eighth-grade assessment test revealed that M.W. was not proficient in all areas of reading and was not proficient in most areas of math.  Despite these scores, M.W. was promoted to ninth grade.  M.W. continued to meet with a tutor daily for math and reading, and she attended a learning-strategies class during school hours to address her deficiencies in these academic areas.

In order to develop M.W.'s IEP for tenth grade, Ms. W. completed a parent survey and met with the IEP team in April 2012. In the parent survey, Ms. W. stated that she believed that M.W. needed the most help with math, note taking, and organization. Ms. W. also expressed additional concerns regarding the scores that M.W. had recently received on the ninth-grade achievement test, as well as her general inability to take standardized tests. The results of the achievement test revealed that despite the fact that she was entering the tenth grade, M.W. was reading at a 3.6-grade reading level, and her math abilities were at a 2.6-grade level. M.W. was also having substantial issues with hearing loss. Significantly, the IEP survey reveals that Ms. W. told that IEP team that M.W. was being fitted for a hearing aid.

M.W.'s tenth-grade IEP memorialized her mother's concerns, M.W.'s results on the ninth-grade achievement test, and the fact that M.W. continued to struggle with organization despite the implementation of various strategies. It also noted that M.W. had been diagnosed with dyslexia and "will be fitted for a hearing aid." As in prior years, however, the IEP provided goals in only the areas of reading, math, and transition. With respect to transition, the IEP noted that M.W. lacked the ability to demonstrate personal management and communication skills. The goal selected with respect to transition was, by the end of the school year, M.W. would be able to distinguish between effective and ineffective

communication skills with 80% accuracy.   M.W.'s special-education teacher explained that the transition goal was meant to improve M.W.'s ability to communicate her ideas, feelings, and needs to adults because she was a shy student who didn't talk much.

Despite the fact that the IEP team was informed that M.W. was going to be fitted for a hearing aid and her special-education teacher found it necessary to develop a goal with respect to M.W.'s communication skills, it did not explore the need to evaluate M.W.'s hearing loss or whether that hearing loss had an effect on her academic progress.

A few months following the development of the IEP, Ms. W. made the decision to remove M.W. from public school and place her in a private school for tenth grade.   On July 24, 2012, Ms. W. filed a request for a due-process hearing because she believed that the Board had failed to properly evaluate M.W. and provide her with adequate services.

Following removal from public school, on August 29, 2012, Ms. W. brought her daughter to a speech language pathologist, Laura Promer, to conduct an independent evaluation of M.W.   The results of Promer's assessment were that M.W. evidenced "profoundly impaired language skills with poor receptive and expressive abilities."   Although M.W.'s reading skills were found to be adequate, her written expression was below average.   Due to this discrepancy, Promer

recommended further assessment in the area of auditory processing. Promer also recommended that M.W. receive language intervention three-to-five times weekly for one-hour sessions from a speech pathologist with the goal of improving M.W.'s receptive and expressive language skills.

Based upon Promer's recommendation, Ms. W. took M.W. for an auditory-processing evaluation, which was conducted by audiologist Julibeth Jones on March 1, 2013. Jones found that M.W. demonstrated the presence of longstanding, fluctuating conductive hearing loss and M.W. had moderate to severe difficulty understanding speech in the presence of competing background noise. According to Jones, M.W.'s hearing loss was permanent, and her hearing was so poor that she spent the vast amount of her energy in school just trying to hear what was being said.

Among other things, Jones recommended that M.W. receive language intervention from a speech therapist three-to-five times weekly for one-hour sessions. In Jones's view, M.W. qualified for special-education and related services under the category "hearing impaired." Further, Jones opined that M.W. "may benefit from use of a personal FM system during all academic instruction. FM systems are a group of tools or 'assistive listening devices' that are widely used by children and adults with hearing loss." Next, Jones believed that a strong probability existed that "complex interactions exist between [M.W.'s] hearing loss,

13

listening difficulties, ADHD, dyslexia, and language deficit that contribute to the academic challenges [M.W.] has encountered."[3]  Finally, Jones testified that if a parent had told her that a child was being fitted for a hearing aid, it would be an immediate "red flag" that the child requires further assessment by the school.

Beginning on March 4, 2013, a Hearing Officer heard testimony relating to Ms. W.'s due-process complaint.  The hearing lasted seven days.  Following the lengthy hearing, the Hearing Officer found in favor of the Board and against Ms. W.  In doing so, the Hearing Officer concluded that Ms. W. had not met her burden to show that the Board had violated the IDEA by failing to properly evaluate M.W. or to provide her with a FAPE. [4]  Ms. W. appealed the decision of the Hearing Officer by filing a complaint in the District Court for the Northern District of Alabama.  After reviewing the record and holding a hearing, the district court entered an order affirming the decision of the Hearing Officer.  Ms. W. then filed her notice of appeal.

## III.

The question of whether an educational program provided an adequate education under the IDEA is a mixed question of law and fact.  *Draper v. Atlanta*

---

[3] In a follow-up report, Jones recognized that M.W. had been seen by an ENT physician, who completed a procedure to remove cerumen from M.W.'s right ear and replace the T-tube in her left ear.  The physician recommended that M.W. be fitted for a hearing aid for her right ear. In light of this information, Jones updated her report to include this recommendation.

[4] The Hearing Officer, however, memorialized the fact that the Board agreed to pay for the independent evaluations conducted by Promer and Jones.

*Indep. Sch. Sys.,* 518 F.3d 1275, 1284 (11th Cir. 2008) (citation omitted).  We

review *de novo* questions of law, such as the interpretation of a federal statute.  *Id.*

We review specific findings of fact for clear error.  *Id.*  Here, where the district

court's findings are based on a cold administrative record, "we stand in the same

shoes as the district court in reviewing the administrative record and may,

therefore, accept the conclusions of the ALJ and district court that are supported by

the record and reject those that are not."  *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757

F.3d 1173, 1181 (11th Cir. 2014) (citation omitted).

## IV.

We begin by noting that the IDEA creates a presumption in favor of the

education placement established by a child's IEP, and the party attacking its terms

bears the burden of showing why the educational setting established by the IEP is

not appropriate.  *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1291-92

(11th Cir. 2001) (citation and brackets omitted).

Here, Ms. W. contends that the Board failed to comply with the procedural

requirements of the IDEA because it did not "timely and comprehensively"

evaluate her daughter, particularly with respect to her hearing and language

capabilities.  She also asserts that the Board failed to provide special-education

programs sufficient to enable M.W. to make reasonable progress, so it denied

M.W. a free appropriate public education.

According to Ms. W., a proper evaluation would have uncovered the cause of M.W.'s skill deficits so that that Board could have better identified how to meet her needs.  Ms. W. also avers that, in affirming the Hearing Officer's decision, the district court improperly placed the burden on her to request an evaluation of her daughter's hearing.  Because both the Hearing Officer did not recognize that the Board, itself, had a duty to evaluate when conditions so warrant—even absent a parent's request—we find that the Hearing Officer erred in this case.

The IDEA requires the Board to conduct a "full and individual initial evaluation" of M.W. to determine whether she was disabled and qualified for special-education services.  20 U.S.C. § 1414(a)(1)(A)-(C).  Ms. W. does not appear to assert that the Board failed to conduct an initial evaluation of M.W., nor could she in light of the fact that the Board conducted a comprehensive initial eligibility evaluation in 2005, which assessed M.W.'s I.Q., achievement, behavior, hearing, and vision.

The IDEA, however, also requires reevaluations to be performed "if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; *or* . . . if the child's parents or teacher requests a reevaluation."  20 U.S.C. § 1414(a)(2)(A) (emphasis added).  Reevaluations shall occur "not more frequently than once a year, unless the parent and the local

16

educational agency agree otherwise; and . . . at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary." 20 U.S.C. § 1414(a)(2).

Although M.W.'s triennial evaluation was due in April 2008, Ms. W. concedes that she agreed to forego reevaluation at the time due to the IEP team's concerns that M.W. might "test out" of special-education services.  But Ms. W. is correct that her acquiescence to forego reevaluation in 2008 does not excuse the Board from conducting any future reevaluation of M.W. or an evaluation for a disability separate from M.W.'s learning disability.

The salient question here is whether the Board was on notice that the circumstances warranted a reevaluation.  Ms. W. contends that it was because the Board knew that M.W. had hearing loss and that she was being fitted for a hearing aid.  According to Ms. W., this information should have alerted the Board of the need to evaluate M.W. for hearing and language impairments.  We agree.

Aside from the requirements with respect to reevaluations, the IDEA provides that "[e]ach local educational agency shall ensure that . . . the child is assessed in all areas of *suspected* disability."  20 U.S.C. § 1414(b)(3)(B) (emphasis added).  This provision places upon school districts "a continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statutes."  *P.P. ex rel. Michael P. v. W. Chester Area Sch.*

17

*Dist.,* 585 F.3d 727, 738 (3d Cir. 2009). A hearing impairment constitutes a disability under the IDEA. *See* 20 U.S.C. §1401(3)(A)(i). And the recognition of such an impairment potentially qualifies the student for special education and related services under the IDEA.

On this record, at least twice, Ms. W. informed the IEP team that M.W. suffered from hearing loss. This information should have alerted the Board that an evaluation of M.W.'s hearing was necessary. Beginning with the later information, Ms. W. clearly provided notice to the Board of M.W.'s substantial hearing loss when meeting with the IEP team to develop her daughter's tenth-grade IEP in April 2012. Significantly, Ms. W. informed the team that M.W. "will be fitted for a hearing aid." At the same time, Ms. W. voiced her concern about M.W.'s results on the ninth-grade STAR test, which showed that she was reading at a third-grade level and performing in math at a second-grade level. M.W. also continued to struggle with organization despite the implementation of various strategies. The IEP developed for M.W.'s tenth-grade year specifically memorialized that M.W. "will be fitted for a hearing aid" and noted that M.W. lacked the ability to demonstrate personal management and communication skills.

In addition to this notice, at the end of M.W.'s fifth-grade year, her mother told the IEP team that M.W. had a "history of having tubes in her ears and her hearing in her left ear is worse than it was two years ago." Notes from the IEP

meeting add that M.W.'s "parents are going to pursue treatment." We recognize that, perhaps, a statement that a student's hearing is "worse" than it was two years ago may not, in and of itself, prompt a school board to suspect a hearing impairment. But here, the statement was coupled with information that the hearing loss was significant enough to require *treatment*. The fact that the Board knew that Ms. W. was actively seeking treatment for M.W.'s hearing loss supports a finding that the Board should have at least "suspected" that a hearing impairment might be present. *Cf. Draper*, 518 F.3d 1275, 1281 (11th Cir. 2008) (student who wrote letters and numbers backwards put school on notice that an evaluation for dyslexia should have been performed); *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, (9th Cir. 2008) (once becoming aware of doctor's suspected diagnosis of autism, school was on notice that student likely suffered from a form of autism and an evaluation was required).

The Hearing Officer seems to suggest that the information provided to the Board in 2008 regarding M.W.'s hearing loss should not be considered because it is outside the applicable statute of limitations. If this is what was meant by the Hearing Officer, we disagree. Statutes of limitations operate to bar *claims* that mature outside the applicable limitations period—here, the period more remote

19

than the two years prior to Ms. W.'s filing her claim in July 2012.[5]  But, *evidence that is relevant to establish claims maturing within this limitations period is admissible*.  *See e.g., Draper*, 518 F.3d at 1287-88; *Cf. Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 n.11 (11th Cir. 1999) (district court's suggestion in § 1983 case that evidence outside the limitations period would not be considered was erroneous); *Williams v. City of Dothan, Ala.*, 745 F.2d 1406 (11th Cir. 1984) (district court erred in limiting discovery to events occurring years before commencement of limitations period, where evidence was relevant to discriminatory intent during the limitations period).

Here, the 2008 comment—that M.W. had a "history of having tubes in her ears and her hearing in her left ear is worse than it was two years ago"—is evidence that further supports the 2012 evidence that the Board was on notice of the need to reevaluate M.W.  While M.W.'s hearing in 2008 may not have been bad enough for Ms. W. to realize that her daughter needed a hearing-assistive device at that time, the comment nonetheless put M.W.'s hearing on the Board's radar screen, and in view of subsequent communication and other difficulties that M.W. was experiencing in school, certainly provided support for M.W.'s claims that later accrued within the limitations period.  Because the 2008 conversation regarding M.W.'s hearing loss constitutes relevant evidence, it should have been

---

[5] 20 U.S.C. § 1415(f)(3)(c) provides a two-year statute of limitations with respect to claims brought under the IDEA.

20

considered by the Hearing Officer.  The Hearing Officer's apparent refusal to consider this evidence was error.

We find that both of these pieces of evidence—particularly when viewed against M.W.'s myriad of other problems in school—put the Board on notice that M.W. suffered from a hearing disability that warranted further investigation.  Nor do we find the Hearing Officer's reason for reaching the opposite conclusion that Ms. W. "must have been aware of the problems, yet there does not appear to be any evidence that [Ms. W.] ever expressed a need or desire for further evaluation. . ."—justifies the Hearing Officer's decision to overlook the Board's shortcoming in this regard.  While it is certainly true that Ms. W. did not request an evaluation of her daughter's hearing, the fact that she did not do so did not absolve the Board of its independent responsibility to evaluate a student suspected of a disability, regardless of whether the parent seeks an evaluation.  *See* 20 U.S.C. § 1414(b)(3)(B).  Even where a parent is aware of a suspected disability, the Board is required to act.  *Cf. Hellgate*, 541 F.3d at 1209 (school did not fulfill obligations of IDEA by simply referring parents to facility for testing because such action does not ensure that student is assessed); *see also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994) (holding that a parent's failure to obtain evaluation did not excuse the school district's obligation under the IDEA to secure the evaluation).

21

Indeed, the Board had a separate and independent responsibility to propose an evaluation when faced with evidence of M.W.'s hearing loss and subpar academic performance. *See M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996) ("[A] child's entitlement to special education should not depend upon the vigilance of the parents. . . . Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly."). By the time the Board first became aware of M.W.'s hearing loss, she was already being treated for SLD and she continued to struggle academically.

While it is true that the Hearing Officer noted that M.W.'s special-education teacher testified that he had no information to create a suspicion that M.W. had a hearing disability that necessitated special education services and that Board witnesses testified that they had "no information to create a suspicion that [M.W.] had a hearing disability that necessitated special education and related services, nor did the IEP team have any indication that a hearing evaluation was needed," the objective record flatly contradicts the Board's witnesses. Ms. W. told the IEP team that her daughter was being "fitted for a hearing aid." For this reason, the Board's contention that it did not have "any indication that a hearing evaluation was

22

needed" was objectively wrong, especially when coupled with the knowledge that M.W. lacked adequate abilities to demonstrate communication skills.

We also disagree with the Board's contention that it lacked sufficient time to conduct an evaluation of M.W. because her mother withdrew her from school before her tenth-grade year. The IEP team and Ms. W. met on April 12, 2012, to develop M.W.'s tenth-grade IEP, but Ms. W. did not withdraw M.W. from school until after the IEP team prepared M.W.'s tenth-grade IEP and M.W. completed her ninth-grade year—some two months later. Accordingly, the Board had at least two months before M.W. left the school to conduct or, at a minimum, schedule a hearing evaluation. Moreover, at the time that the Board developed M.W.'s tenth-grade IEP, the Board had no idea that Ms. W. would later withdraw her daughter from school.

And even if the Board believed that it lacked time during the ninth-grade school year to provide for such evaluation, it could have memorialized its future intent to do so in the April 2012 IEP.[6] The IEP was intended to develop goals and strategies for the *upcoming* school year. The fact that the IEP, as finalized, does not mention any further provision of evaluation or services with respect to M.W.'s hearing demonstrates that the Board had no intention of evaluating M.W.'s hearing. We also emphasize that the Board's duties with respect to M.W. did not

---

[6] We also note that the School Board's duties do not subside over the summer months.

23

end when her mother enrolled her in private school.  *See* 34 C.F.R. § 300.132; 71 Fed. Reg. 46593.

Ultimately, we find that that the Board was aware that M.W. had undergone seven ear surgeries, had hearing that was worsening in her left ear to the point that treatment was necessary, and was later being fitted for a hearing aid.  M.W.'s special-education teacher himself also recognized that M.W. lacked appropriate communication skills.  Under these circumstances, the Board should have at least "suspected" that M.W. had a hearing impairment.[7]  It was, therefore under a duty to assess this area of suspected disability pursuant to 20 U.S.C. § 1414(b)(3)(B). Under 20 U.S.C. § 1414(a)(2)(A), conditions warranted reevaluation of M.W. by the Board.  Indeed, notification that M.W. was being fitted for a hearing aid, alone, should have raised a red flag that an evaluation was necessary to determine whether M.W. suffered from a hearing impairment necessitating further services. Here, however, the Board failed to evaluate M.W.'s hearing, and it does not appear that the Board even bothered to follow up on any hearing tests performed by M.W.'s own doctors.  The Board appears to have simply ignored M.W.'s hearing-loss issues.

---

[7] The Board's expert witness also testified that the obligation to conduct an evaluation under the IDEA arises upon a student's being suspected of having a disability and in need of special-education services.

We conclude that the Board violated the procedural requirements of the IDEA by failing to evaluate M.W. when faced with evidence that she suffered from a suspected hearing impairment. *See e.g., Draper*, 518 F.3d at 1281.  As a result of its failure to obtain necessary medical information regarding M.W.'s hearing, the Board further failed to provide her with a FAPE.  The lack of medical information rendered the accomplishment of the IDEA's goals impossible because no meaningful IEP was developed, and the IEPs put into place lacked necessary elements with respect to the services that M.W. should have been provided.  In short, the Board's failure to evaluate M.W. with respect to her hearing loss deprived M.W. of the opportunity to benefit educationally from an appropriate IEP.  *See Hellgate Elem. Sch. Dist.*, 541 F.3d at 1208 (failure to meet obligations to evaluate student in all areas of suspected disability was a procedural error that denied student a FAPE; without evaluation that student had autism, it was not possible for IEP team to develop a meaningful plan); *see also Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) ("An IEP which addresses the unique needs of the child cannot be developed if those people who are most familiar with the child's needs are not involved or fully informed.").

## V.

For the reasons discussed above, we reverse the judgment of the district court in favor of the Board and against Phyllene W.  This matter is remanded to the

district court for entry of judgment in favor of Appellant.  We leave it to the district court to determine the precise relief to be given to Appellant.

**REVERSED and REMANDED.**