[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14880
_____

D.C. Docket No. 1:07-cv-20321-JAL


R.L.,
S.L.,
individually, and on behalf of O.L., a minor,

Plaintiffs-Appellees
Cross Appellants,


versus


MIAMI-DADE COUNTY SCHOOL BOARD,

Defendant-Appellant
Cross Appellee.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 2, 2014)

Before MARTIN, FAY, and SENTELLE,[*] Circuit Judges.

MARTIN, Circuit Judge:

This appeal arises out of a lengthy and contentious dispute between the Miami-Dade County School Board (the Board) and R.L. and S.L., whose son O.L. has been diagnosed with developmental and digestive disorders that have greatly impacted his educational needs. After years of difficulties resulting at least in part from the growing size of his school environments, O.L.'s parents asked the Board to place him in a smaller high school than his 3600-student home high school. When the Board refused, and after the high school placement proved unworkable for O.L., his parents withdrew him from the public school system and arranged for him to receive one-on-one instruction outside the school setting. In this appeal, the Board challenges the District Court's decision to award O.L.'s parents reimbursement for that instruction as well as some of their attorney's fees. R.L. and S.L. cross appeal from the District Court's decision not to award O.L. compensatory education. After careful review, and with the benefit of oral argument, we affirm.

## I. Background

Before we reach the merits of this case, we review three important background matters. First, we review the Individuals with Disabilities Education

_____

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

2

Act (IDEA), 20 U.S.C. § 1400 et seq., in order to put the case in context. Next, we review the facts of O.L.'s disabilities, the history of his education in the Miami-Dade County School System, and the dispute between the Board and O.L.'s parents that gave rise to this litigation. Finally, we review the decisions of the District Court as well as the Administrative Law Judge (ALJ).

## A.  Legal Background

The IDEA extends federal financial assistance to states that agree to provide an education to children with disabilities consistent with the standards and requirements set out in the statute. See 20 U.S.C. § 1412(a). Procedurally, the IDEA requires (among other things) that the state[1] develop and conduct a yearly review of an Individualized Education Program (IEP) that addresses the student's unique needs. Id. §§ 1412(a)(4), 1414(d)(4)(A). The IEP is supposed to be the culmination of a collaborative process between parents, teachers, and school administrators outlining the student's disability and his educational needs, with the goal of providing the student with a free appropriate public education (FAPE). Id. §§ 1401(9), 1412(a)(1)(A), 1414(d)(1)(A)–(B), (d)(3). Among the decisions that must be made by the IEP team is the educational placement—that is, the setting

---

[1] The responsibility for the on-the-ground work for individual students generally falls on local educational agencies like the Miami-Dade County School Board here. See 20 U.S.C. §§ 1401(19)(A), 1413. In this opinion, we use the term "state" to refer to the agency charged with providing a child's education. We do this while recognizing that disputes about the particulars of a student's day-to-day education more often arise between parents and the local district, as opposed to the state.

where the student will be educated—which must be "based on the child's IEP."  34 C.F.R. § 300.116(a)–(b).  Once arrived at, the final IEP should comply with the procedural and substantive requirements set forth in the IDEA and should be "reasonably calculated to enable the child to receive educational benefits."  JSK v. Hendry Cnty. Sch. Bd., 941 F.2d 1563, 1571 (11th Cir. 1991) (quoting Bd. of Educ. of Hendrick Hudson Centr. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 3051 (1982)).

The IDEA recognizes, however, that this collaborative process might not always yield results acceptable to all members of the IEP team.  If the parents believe that the IEP does not comply with the IDEA's requirements, they may unilaterally withdraw their child from the school system and pursue alternative placement options.  See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369–70, 105 S. Ct. 1996, 2002–03 (1985).  Whether or not the dissatisfied parents pursue alternative placement options, either the state or the parents can file a complaint with the appropriate state administrative agency and get a due process hearing before an ALJ to resolve the dispute.  20 U.S.C. § 1415(f)(1)(A); see also Fla. Stat. § 1003.57(c) (describing Florida's administrative complaint process for children with special needs).  If either party disagrees with the administrative agency's decision, they can appeal by filing suit

either in state court or in United States District Court.  20 U.S.C. § 1415(i)(2)(A).

O.L.'s parents chose the latter.

On appeal, the District Court reviews the evidence presented to the ALJ and may hear additional evidence if needed.  Id. § 1415(i)(2)(C)(i)–(ii).  After reviewing all the evidence, the District Court may grant relief without a trial by issuing what we have called a "judgment on the record."  Loren F. v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1313 (11th Cir. 2003).  A District Court may issue a judgment on the record based "on the preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C)(iii), even when facts are in dispute.  Loren F., 349 F.3d at 1313.  When weighing the evidence, the District Court gives "due weight" to the ALJ decision, and "must be careful not to substitute its judgment for that of the state educational authorities."  Walker Cnty. Sch. Dist. v. Bennett, 203 F.3d 1293, 1297 (11th Cir. 2000).  But the ALJ is not entitled to blind deference.  The District Court is free to accept the ALJ's conclusions that are supported by the record and reject those that are not.  Loren F., 349 F.3d at 1314.  At the same time, when the District Court rejects the ALJ's conclusions, it is "obliged to explain why."  Id. at 1314 n.5 (quotation mark omitted).

District Courts have broad discretion to fashion whatever relief is "appropriate" in light of the IDEA's purpose.  Burlington, 471 U.S. at 369, 105 S. Ct. at 2002.  This relief can include reimbursement for costs incurred by parents

5

while pursuing an alternative placement.  See id.  Also available to the District Court is an award of compensatory education, by which the Court orders extra educational services designed to compensate for a past deficient program.  Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1280 (11th Cir. 2008).

### B.  Educational Background

O.L. has been diagnosed with different disorders at different times in his life.  These include Asperger Syndrome, Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, and gastroesophageal reflux disease (GERD).  This combination of disorders causes O.L. to have serious trouble with anxiety, obsessive compulsive behavior, and sensory processing.  Because of his sensory processing challenges, he suffers from sensory overload when there is too much going on in his surrounding environment—for example, when he is in a crowded place with a lot of background noise.  When O.L. becomes anxious or overwhelmed by his surroundings, he experiences extreme fatigue, headaches, stomach aches, vomiting, muscle tics, and behavioral problems.

O.L. began his education in the Miami-Dade County public schools.  His most debilitating symptoms did not emerge until his last year of elementary school, where about 700 students attended.  In fifth grade, anxiety and sensory overload caused him to vomit frequently.  O.L.'s symptoms got worse the next year, when he moved to Palmetto Middle School, which had 1700 students.  He continued to

6

deteriorate as he entered the seventh grade, and his muscle tics, obsessive compulsive behavior, headaches, and vomiting became progressively worse. Eventually, he became exceptionally violent and destructive at home, sometimes requiring his parents to administer emergency medication to calm him down. O.L.'s symptoms became so bad during the seventh grade that his parents removed him from school in December 2004 and considered admitting him to a psychiatric hospital. There was a consensus among his private treatment team, which included a psychiatrist, an audiologist, and a school psychologist, that this regression resulted from the sensory overload he experienced in the large school environment.

During O.L.'s medical leave, the Board provided him with a couple hours of one-on-one home instruction each day, which O.L.'s parents supplemented at their own expense. Within three months, his symptoms were under control and O.L. was able to return to school on a modified schedule. Under this modified schedule, O.L. received a few hours of instruction at Palmetto Middle School and then returned home each day for a few more hours of one-on-one home instruction.

O.L. continued at Palmetto Middle School for eighth grade, at the recommendation of his psychiatrist. In the beginning, he split his day between school and home instruction, like he had done at the end of seventh grade. After several weeks, the IEP team increased school instruction, but O.L. still spent part of the day in one-on-one home instruction. Unfortunately, O.L. did not respond

well to the increased school instruction, and the symptoms that necessitated his withdrawal the year before re-emerged. Even so, the IEP team increased his school and home instruction even more in response to O.L.'s poor academic performance. Despite the IEP team's persistence, O.L. did not progress much during his eighth grade year.

Against this backdrop, R.L., S.L., and the rest of O.L.'s IEP team met to craft O.L.'s IEP for his transition from middle school to high school. If O.L. continued in his local public school, he would attend Palmetto Senior High School. Palmetto Senior High School had 3600 students, more than double the size of Palmetto Middle School.

The IEP team met on April 24, May 16, and May 22, 2006. Before the meetings, R.L. and S.L. made it clear to the Board that they strongly favored placing O.L. in a smaller school environment closer in size to his elementary school. Again at the meetings, R.L. and S.L. reiterated their strong preference for a smaller school, arising from their belief that O.L.'s problems throughout middle school were due at least in part to the school size. R.L. and S.L. very much favored placement at MAST Academy, a small magnet school in Miami-Dade County. The Board rejected the idea of MAST Academy for O.L., and told R.L. and S.L. that O.L. would attend Palmetto Senior High School and no other site would be considered.

8

The team finished the IEP, identifying Palmetto Senior High School as O.L.'s educational placement, over his parents' objection.  Even though R.L. and S.L. disagreed with the decision, they started O.L. at Palmetto Senior High School, to see if he could be accommodated in that setting.  Unfortunately, the severe symptoms O.L. suffered during middle school returned within the first few days.  By the third day, he had a moderate muscle tic and was vomiting.  O.L.'s parents wanted to withdraw him, but his psychiatrist encouraged them to see if O.L. would improve after some modifications to his medications.

But O.L.'s symptoms only got worse, not better.  He became more anxious, had difficulty sleeping, became more obsessive compulsive, and he continued to vomit.  And, similar to the breakdown he had in the seventh grade, O.L.'s behavior at home was almost uncontrollable.  He began throwing himself on the floor, screaming, and breaking doors.  After seeing their child regress so much in such a short period of time, R.L. and S.L. decided to withdraw O.L. from Palmetto Senior High School

And indeed, O.L.'s symptoms improved after he stopped attending Palmetto Senior High School.  At the same time, however, he became more reclusive and obsessed with certain activities.  O.L.'s parents decided to design a one-on-one instructional program, like the one he had when he was withdrawn from school in the seventh grade.  The program featured several hours of one-on-one instruction

9

along with Medicaid-covered speech and occupational therapy, services which O.L.'s IEP called for him to receive had he remained enrolled at Palmetto Senior High School. O.L. remained in this program for the rest of the 2006–2007 year and the 2007–2008 year.[2] For most of that time, the one-on-one instruction was provided by a former public school special education instructor, who believed the program provided O.L. with some educational benefits.

## C.  Procedural Background

The Board requested an administrative due process hearing, for a determination about whether the IEP was appropriate. R.L. and S.L. filed a cross-complaint against the school, seeking appropriate relief for what they saw as a violation of O.L.'s rights under the IDEA.

The parents alleged a number of procedural problems, but the ALJ found that none violated the IDEA. Only one of the alleged procedural violations matters for this appeal. That is predetermination. R.L. and S.L. argued before the ALJ that the school district predetermined O.L.'s educational placement at Palmetto Senior High School without regard for O.L.'s unique needs. In the language of the IDEA and its implementing regulations, R.L. and S.L. argued that their son's educational placement was not chosen by the entire IEP team "based on" the completed IEP.

---

[2] The Board's brief on appeal represents that it developed a new IEP in February 2007 addressing the deficiencies noted by the ALJ, which are described below. However, we do not consider the February 2007 IEP in this appeal because the District Court denied the Board's motion to enter the IEP into evidence.

See 34 C.F.R. § 300.116(a)–(b).  The ALJ disagreed, concluding that the Board's position that no other site besides Palmetto Senior High School would be considered "does not mean that no other site had been considered."

The ALJ found that the Board did, however, violate the IDEA's substantive requirements because the IEP was not reasonably calculated to provide O.L. with any educational benefit.  The ALJ specified two discrete areas in which the IEP failed to meet O.L.'s educational needs: (1) anxiety, stress, and sensory management and (2) reading comprehension.  Due to the significance of these shortcomings, the ALJ concluded that the entire educational program deprived O.L. of his right to a FAPE.

Apparently at the parties' request, the ALJ also considered what educational placement would be appropriate for O.L.  The ALJ decided that the setting of Palmetto Senior High School would not itself deprive O.L. a FAPE.  In other words, the ALJ decided that the Board could hypothetically provide O.L. a FAPE at Palmetto Senior High School if it developed an IEP that met O.L.'s unique needs.  In reaching this conclusion, the ALJ gave little weight to "the shared opinion of [O.L.'s] professionals that he requires a small high school so as to control environmental stimulation and allow him to access his education."

R.L. and S.L. filed for review of the ALJ decision in District Court.[3]  The

District Court reviewed the case in two phases.  In the first phase, the District

Court considered whether and to what extent the Board had deprived O.L. of a

FAPE.  The District Court noted that there was no dispute about whether the IEP

complied with the IDEA's substantive requirements, because "[n]either party

challenge[d] the ALJ's finding that the IEP deprives O.L. of a FAPE by failing to

adequately address O.L.'s educational needs."  While recognizing this point of

agreement, the District Court went on to disagree with the ALJ's conclusion that

Palmetto Senior High School could be an appropriate setting.  The District Court

found, in contrast to the ALJ, that a large setting like Palmetto Senior High School

"cannot provide O.L. with an appropriate education."  The District Court also

disagreed with the ALJ's finding about procedural compliance when it found that

O.L.'s placement at Palmetto Senior High School had been predetermined in

contravention of the IDEA.

In the second phase of review, the District Court considered what relief

should be granted.  The District Court heard additional evidence about whether

O.L.'s one-on-one program was appropriate and also whether he needed

compensatory education.  Based on this evidence, the District Court decided to

_____

[3] Many IDEA cases come to District Courts with an extraordinarily large and complicated record, requiring much time and attention to reach the right result.  District Judge Joan A. Lenard, Magistrate Judge Edwin G. Torres, and Magistrate Judge Barry L. Garber should be commended for their excellent work on this case.

12

grant O.L.'s parents full reimbursement for the one-on-one program from September 2006 through May 2008, and ordered the Board to reimburse Medicaid for the cost of the speech and occupational therapy.  The District Court, however, denied R.L. and S.L.'s request for compensatory education.  Finally, the District Court awarded R.L. and S.L. $35,435.64 in attorney's fees and costs, a reduction from the $167,417.76 the parents requested.

Upon the District Court's resolution of all of these issues, both parties appealed.   The Board challenges (1) the District Court's finding that the educational placement was both predetermined and inappropriate; (2) the District Court's decision to award R.L. and S.L. reimbursement for one-on-one instruction and reimbursement to Medicaid; and (3) the award of attorney's fees to R.L. and S.L.  The parents challenge the District Court's denial of compensatory education.

## II. Standard of Review

A few different standards govern our review of this case.  We review de novo questions of law, like the interpretation of the governing statutes and regulations.  See Draper, 518 F.3d at 1284.  We review findings of fact for clear error.  Id.  But where the District Court's finding is based solely on a cold administrative record, "we stand in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that are supported by the record and reject those that are

13

not." G.J. v. Muscogee Cnty. Sch. Dist., 668 F.3d 1258, 1268 (11th Cir. 2012) (quotation marks omitted).

With these background principles in mind, the extent to which we scrutinize the District Court's decision varies depending on the issue under review. There are two stages to a District Court's determination of whether to grant relief and what relief to grant, and our review of the decisions made at each stage is different. In the first stage, the District Court considers whether parents are eligible for reimbursement. When parents reject the offered IEP and unilaterally pursue an alternative placement, they are eligible for reimbursement only if (1) the state did not offer an educational program that would provide a FAPE; and (2) the alternative placement the parents pursued was appropriate for the child. M.M. v. Sch. Bd. of Miami-Dade Cnty., Fla., 437 F.3d 1085, 1096 (11th Cir. 2006) (per curiam). Whether a state- or parent-provided educational program provides an adequate education under the IDEA is a mixed question of law and fact subject to de novo review. Draper, 518 F.3d at 1284.

If the evidence shows that the parent is eligible for reimbursement, then the District Court moves on to the second stage, in which it determines the relief due to the parent. At this stage, we review the District Court's decision only for abuse of discretion. Id.

14

### III. Eligibility for Reimbursement

First, we must ask whether the District Court was right to conclude that R.L. and S.L. are eligible for reimbursement. As we've said, R.L. and S.L. are only eligible for reimbursement if we find that (1) the Board failed to make an offer of FAPE and (2) the alternative one-on-one instructional program the parents chose was appropriate for O.L. See M.M., 437 F.3d at 1096.

The Board's position about whether its educational program offered O.L. a FAPE is confusing to say the least. In the answer to R.L. and S.L.'s complaint in the District Court, the Board denied that the ALJ found that the IEP failed to offer O.L. a FAPE. The Board made this denial in the face of the ALJ's express finding that the IEP's shortcomings in stress management and reading comprehension "are such that the IEP is not reasonably calculated to provide [O.L.] with educational benefit." Now in this appeal, the Board seems to argue that they did make an offer of FAPE, despite the shortcomings the ALJ identified. At the same time, though, the Board has clearly conceded that it failed to fully meet O.L.'s needs, and the District Court was led to believe based on the Board's arguments that it conceded that it failed to offer O.L. a FAPE.

Based on the Board's concessions in the District Court, it found that "[n]either party challenged the ALJ's findings that the IEP deprives O.L. of a FAPE." On our read of the Board's brief, it has not clearly articulated a challenge

15

to the District Court's decision that it failed to challenge the FAPE issue before it. Thus, to the extent the Board now argues that it did offer O.L. a FAPE, its challenge to the District Court's contrary finding on procedural grounds is waived. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants the Court to address should be specifically and clearly identified in the brief.").

Even if the Board did preserve a challenge to the question of whether it offered O.L. a FAPE, the argument should be rejected. The ALJ spent many pages describing the IEP's shortcomings in the areas of stress management and reading comprehension, and why those shortcomings rendered the whole educational program deficient. We do not need to discuss the evidence here, because it is clear from the record and the ALJ's discussion that the May 2006 IEP did not and could not meet O.L.'s needs and enable him to access his education. Cf. Rowley, 458 U.S. at 206–07, 102 S. Ct. at 3051 (noting that the IEP must be "reasonably calculated to enable the child to receive educational benefits" to comport with the IDEA's requirements).

The Board seems to suggest that if the District Court was wrong about whether the placement was predetermined and whether it was appropriate, then R.L. and S.L. are not eligible for reimbursement. This argument misses the mark. It is certainly true that not every failure to meet the IDEA's procedural

requirements entitles parents to reject the IEP and pursue reimbursement for an alternative placement.  See Weiss v. Sch. Bd. of Hillsborough Cnty., Fla., 141 F.3d 990, 996–97 (11th Cir. 1998) (per curiam).  But where, as here, the substance of the IEP is so deficient that it cannot allow the student to access his education, the question of whether the IEP was completed in keeping with all the procedural requirements makes no difference to the parents' eligibility for reimbursement.  Neither does it matter whether the chosen placement itself violates the IDEA.  As the ALJ concluded, the May 2006 IEP was not good enough to allow O.L. to access his education no matter where it was being implemented.  This means that R.L. and S.L. would be entitled to reject the offered IEP and pursue reimbursement for supplementary educational services even if the Board had acquiesced in placing O.L. at MAST Academy.

For this reason, R.L. and S.L. are right that the predetermination and placement issues have no impact on their eligibility for reimbursement.  But the District Court did take both facts into account when balancing the equities at the relief stage of the analysis, and so we review those findings in that context only.  But to be clear, we do not consider the placement issue at all relevant to the District Court's determination that R.L. and S.L. are eligible to be reimbursed for the expense of educating O.L. where the evidence clearly establishes that the IEP otherwise deprived O.L. a FAPE.

17

Moving to the second stage of the eligibility inquiry, we consider whether the District Court correctly determined that the one-on-one instructional program was appropriate.  See M.M., 437 F.3d at 1096.  An alternative educational program chosen by parents who reject an inadequate program is appropriate so long as it is reasonably calculated to enable their child to receive educational benefits.  See Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12–13, 114 S. Ct. 361, 365 (1993) (noting that a parent is only entitled to reimbursement if the private alternative is "proper under IDEA"); Rowley, 458 U.S. at 206–07, 102 S. Ct. at 3051 (noting that an education is proper under the IDEA only if it is "reasonably calculated to enable the child to receive educational benefits").[4]

The District Court based its finding that the alternative program was proper on the following facts: O.L. used the same textbooks he would have used at Palmetto Senior High School; the program was administered by a special education teacher who opined that the services were reasonable and appropriate; and witnesses for the school district conceded at times that O.L. did in fact receive some educational benefits from the program.  The Court acknowledged that the

_____

[4] We could find no opinion from this Court, nor did the parties cite to one, applying the Rowley standard to a parental placement.  But other Circuit Courts have applied the Rowley standard when analyzing parental placements. See, e.g., Mr. I v. Maine Sch. Admin. Dist. No. 55, 480 F.3d 1, 23–24 (1st Cir. 2007); Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006); M.S. v. Fairfax Cnty. Sch. Bd., 553 F.3d 315, 324 (4th Cir. 2009); Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 855 (6th Cir. 2004).  We are also persuaded that a parental placement should be judged by the Rowley standard, even though parents are not required to fully comply with all the technical requirements of the IDEA, see Carter, 510 U.S. at 13–14, 114 S. Ct. at 365.

18

parents' program "had its shortcomings"—particularly in socialization, an area important to children who are on the autism spectrum.  Nevertheless, it concluded that the preponderance of the evidence showed that the one-on-one program was reasonably calculated to confer at least some educational benefits on O.L.

We agree.  Beyond those reasons cited by the District Court, we are also persuaded by the fact that O.L.'s IEP had historically provided for one-on-one instruction when the alternative educational environment overwhelmed O.L., and this alternative to public school benefitted O.L.  In addition, there was evidence that O.L.'s school psychologist recommended one-on-one instruction in a number of academic areas, which the program R.L. and S.L. chose obviously provided. These facts, coupled with the testimony from O.L.'s primary home instructor— who had been a special education instructor with Miami Dade County for 12 years—that the services were "reasonable" and "appropriate" for O.L.'s educational needs convince us that the District Court was right to find that the alternative program was proper under the standard set forth in Rowley.

At the same time, we recognize there was evidence that O.L. regressed in some areas while receiving one-on-one instruction outside the school setting.  And there can be no doubt that O.L.'s social skills would have been better served in a different environment.  But a parent does not have to provide a perfect program in order to be eligible for reimbursement.  See Loren F., 349 F.3d at 1312 n.1 (noting

19

that FAPE does not require the "best possible" education).  Even if the alternative program has its shortcomings, the question remains whether the program is reasonably calculated to permit the child to obtain some educational benefit.  Here, the parents' program met that standard.

## IV. Appropriate Relief

Having determined that R.L. and S.L. are eligible for reimbursement, we next consider whether the District Court's reimbursement award is appropriate.  In an effort to avoid financial responsibility for O.L.'s one-on-one instruction and related therapy services, the Board makes the following arguments: (1) the services provided through Medicaid were not educationally relevant; (2) District Courts do not have the power under the IDEA to grant reimbursement for home-based instructional programs; and (3) reimbursement should have been reduced or denied on equitable bases.  None of these provide any reason to upset the District Court's reimbursement award.

### A.  Reimbursement to Medicaid

The District Court ordered the Board to reimburse Medicaid for O.L.'s speech and occupational therapy, so that O.L.'s lifetime Medicaid eligibility would be restored.  There is no dispute that O.L.'s educational program has for years called for speech and occupational therapy, educational needs which are even reflected in the Board's challenged May 2006 IEP.  The Board's hyper-technical

20

focus on the fact that these services were characterized as medical services on a Medicaid form rather than educational services is entirely unconvincing. It is clear that, for O.L., these services are related to his educational needs and are therefore reimbursable under the IDEA. See D.P. v. Sch. Bd. of Broward Cnty., 483 F.3d 725, 736 (11th Cir. 2007) (noting that a parent is entitled to reimbursement for the provision of related services in the event the public system does not offer a FAPE); 20 U.S.C. § 1401(26)(A) (defining related services to include "speech-language pathology" services and "physical and occupational therapy"). The District Court was right to look to the actual character of the services provided rather than narrowly focusing on the label for billing purposes.[5]

### B. Reimbursement for One-on-One Instructional Programs

The Board's argument that the IDEA does not permit a District Court to award reimbursement for one-on-one home instructional programs also misses the mark. Section 1415(i)(2)(C)(iii) instructs a District Court that it "shall grant such relief as the court determines is appropriate." The Supreme Court has said that this provision "confers broad discretion on the court" to grant whatever relief is "'appropriate' in light of the purpose of the Act." Burlington, 471 U.S. at 369, 105 S. Ct. at 2002.

---

[5] The Board makes no more than a passing reference to its argument that reimbursement for occupational therapy should be denied because the parents did not allow the Board to provide those services. As a result, the argument is waived. See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1319 (11th Cir. 2012).

21

It is clear to us that in some cases, reimbursement for one-on-one home instructional programs will be "appropriate" in light of the IDEA's purpose. The IDEA clearly contemplates that a state might be required to place a student in one-on-one homebound instruction to meet the student's needs, evidenced by its definition of "special education" to include "instruction conducted . . . in the home." 20 U.S.C. § 1401(29); see also 34 C.F.R. § 300.115 (listing home instruction as part of the continuum of alternative placements states must make available to students to comply with the IDEA). We reject the suggestion that the IDEA might sometimes require the state to place a student in one-on-one homebound instruction, but prohibit a District Court from ever authorizing reimbursement for such a program. If we accept the Board's position, parents with a child who absolutely requires homebound instruction would be left without any remedy if they rejected an IEP offered by the state that placed the child in a normal public school. The IDEA does not countenance such a perverse result. See M.M., 437 F.3d at 1099 ("The Supreme Court has expressly rejected saddling parents of disabled children with . . . a pyrrhic victory." (quoting Justin G. v. Bd. of Educ. of Montgomery Cnty., 148 F. Supp. 2d 576, 587 (D. Md. 2001))).

The Board focuses on 20 U.S.C. § 1412(a)(10)(C)(ii), which says that a parent is entitled to tuition reimbursement when they unilaterally "enroll the child in a private elementary school or secondary school" if the state fails to offer a

22

FAPE.  Because this provision authorizes reimbursement for private schools, the Board says we should understand the IDEA to preclude reimbursement for private non-school placements.  The Board's reliance on § 1412(a)(10)(C)(ii) is not persuasive.

This section upon which the Board relies is not the only section of the IDEA that describes a District Court's remedial powers.  See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 242, 129 S. Ct. 2484, 2493 (2009) (noting that the specific reimbursement provisions outlined in § 1412(a)(10)(C)(ii) do not exhaustively describe the remedial powers granted by § 1415(i)(2)(C)(iii)).  In fact, it isn't even the primary section addressing that issue.  The primary source of a reviewing court's remedial authority is § 1415(i)(2)(C)(iii)—which comes under the heading "Right to bring civil action."  That section defines a reviewing court's remedial authority quite broadly, empowering District Courts to craft whatever remedy is appropriate in any number of factual scenarios that might arise in an IDEA case, instead of just the one factual scenario addressed by § 1412(a)(10)(C)(ii).

The insignificance of § 1412(a)(10)(C)(ii)'s reference to school placement becomes even more clear when we consider that the Supreme Court has already told us that the section does not exhaustively describe, or even strictly limit, a District Court's remedial authority.  See id. at 242, 129 S. Ct. at 2493 (authorizing reimbursement for private school tuition under § 1415(i)(2)(C)(iii) even though all

23

the requirements of § 1412(a)(10)(C)(ii) were not met).  Indeed, the argument the Board makes in this appeal is quite similar to the argument the Supreme Court squarely rejected in Forest Grove.  In that case, the school district argued that because § 1412(a)(10)(C)(ii) "only discusses reimbursement for children who have previously received special-education services through the public school, IDEA only authorizes reimbursement in that circumstance."  Id. at 241, 129 S. Ct. at 2492.  The Supreme Court rejected the argument as "unpersuasive," holding instead that "[t]he clauses of § 1412(a)(10)(C) are . . . best read as elucidative rather than exhaustive."  Id. at 241–42, 129 S. Ct. at 2492–93.

Similarly, the Board maintains here that because § 1412(a)(10)(C) only discusses reimbursement where parents unilaterally place their children in private schools, the IDEA only authorizes reimbursement in that circumstance.  We, of course, accept the Supreme Court's analysis that such an argument is "unpersuasive" and would produce results "bordering on the irrational."  Id. at 241, 245, 129 S. Ct. at 2492, 2495.  Section 1412(a)(10)(C)(ii) does no more than "elaborat[e] on the general rule that courts may order reimbursement when a school district fails to provide a FAPE," and "does not foreclose reimbursement awards in other circumstances" not clearly covered by that section.  Id. at 241–42, 129 S. Ct. at 2493.

Neither are we persuaded by the Board's reliance on <u>Arlington Central</u> <u>School District Board of Education v. Murphy</u>, 548 U.S. 291, 126 S. Ct. 2455 (2006).  In that case, the Supreme Court said that a state could not be ordered to provide certain forms of relief under the IDEA unless the statute "unambiguously" puts the state on notice about their potential liability for that relief.  <u>Id.</u> at 295–96, 126 S. Ct. at 2458–59 (quotation marks omitted).  <u>Murphy</u> has no application here. The IDEA unambiguously put states on notice that they might be responsible for reimbursing parents for homebound instructional placements.  As we explained above, the homebound instructional placement is on the continuum of placements states must make available to children with special needs.  20 U.S.C. § 1401(29); <u>see also</u> 34 C.F.R. § 300.115 ("Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services," which "must" include alternative placements like "home instruction.")  This is enough to unambiguously notify states that the IDEA might require them to reimburse parents who choose such a placement when the state fails to provide an appropriate one.

It is important to remember that all we are considering here is whether the IDEA ever authorizes District Courts to grant relief for one-on-one instruction outside the school setting.  The interpretation of the IDEA we adopt today, which is consistent with both its text and its underlying purpose, will not result in

25

widespread reimbursement for inappropriate placements.  The Supreme Court has said that the mechanism for preventing reimbursement for inappropriate placements is the requirement that the alternative placement be proper in light of the purpose of the IDEA.  Forest Grove, 557 U.S. at 242 n.9, 129 S. Ct. at 2493 n.9.  For all of these reasons, we conclude that the IDEA authorizes a District Court to award reimbursement for one-on-one instructional services outside the school setting.[6]  Whether any particular case calls for the exercise of that authority, of course, depends on the application of the Rowley standard to the specific and unique factual circumstances.  Here, as we've said, application of the Rowley standard leads us to conclude that the District Court's reimbursement award is justified.

## C.  Equitable Factors

Even where a public placement violates the IDEA and the parents provide a proper alternative at their own expense, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."  Forest Grove, 557 U.S. at 246–47, 129 S. Ct. at 2496.  The Board argues that the District Court

---

[6] The position we take today is consistent with a number of other Circuit Court opinions authorizing reimbursement for one-on-one instructional programs.  See Sumter Cnty. Sch. Dist. 17 v. TH, 642 F.3d 478, 483, 489 (4th Cir. 2011) (affirming a District Court award of reimbursement for a purely homebound instructional program); see also T.B. v. St. Joseph Sch. Dist., 677 F.3d 844, 847–48 (8th Cir. 2012) (contemplating that the IDEA would allow for reimbursement for home-based one-on-one instructional programs if they were proper, but nevertheless denying reimbursement because the placement in that case did not meet the standard); Deal, 392 F.3d at 846, 865–66 (awarding reimbursement for 30 hours per week of one-on-one therapy conducted in the home to supplement school-based program).

26

abused its discretion when it decided that the balance of equities comes out in favor of full reimbursement. The Board argues that the following factors weigh in favor of reducing or denying reimbursement here: (1) the parents failed to provide proper notice of the intent to pursue an alternative placement; and (2) the parents acted unreasonably in the IEP negotiating process by failing to cooperate with the Board. We also consider the Board's challenge to the District Court's factual finding that the Palmetto Senior High School placement was predetermined and inappropriate, because the District Court considered its findings on these issues when it balanced the equities and decided not to reduce or deny reimbursement.

We first address the factual dispute about the predetermination and placement questions, which present mixed questions of law and fact we review de novo. See Draper, 518 F.3d at 1284; see also Deal, 392 F.3d at 857 ("This Court's review of the predetermination decision is de novo, since it is a mixed question of law and fact."). Regarding predetermination, the Board argues that the District Court should not have made an adverse finding on the subject because (1) the parents failed to exhaust the issue in the administrative context, and (2) the placement was not, in fact, predetermined.

Before a party can seek federal review of an ALJ's determination in an IDEA case, they must exhaust the claim. 20 U.S.C. § 1415(*l*). This requirement, however, should not be applied inflexibly. N.B. v. Alachua Cnty. Sch. Bd., 84

27

F.3d 1376, 1379 (11th Cir. 1996) (per curiam).  So long as the purposes of exhaustion have been served, the District Court may review the issue.  We have said that exhaustion is designed to (1) permit the exercise of agency discretion and expertise where necessary; (2) allow full development of the issue and the factual record; (3) prevent deliberate disregard for and circumvention of administrative procedures; and (4) avoid unnecessary judicial decisions by giving the agency the first opportunity to correct any error.  Id. at 1378–79.

Here, the purposes of exhaustion have been met.  While it is true that the parents did not use the phrase "predetermination" in their administrative complaint, the parents pleaded several facts and raised several claims which clearly put the predetermination question in play.  For example, the complaint says that "[t]he parents asked the Board to identify options for schools with a population of less than 680 and [the Board] did not consider this request."  Beyond that, the parents claimed that the Board unilaterally proposed to change O.L.'s placement to a large school-based setting, contrary to O.L.'s unique needs and without regard for the parents' objections to the placement.  These pleadings were enough to alert both the agency and the Board to the predetermination claim.  Indeed, the Board responded to that argument, and the ALJ issued a finding based on those arguments.  Thus, the predetermination issue was raised and developed before the

28

agency, and the agency had an opportunity to apply its expertise to the issue.  See id. at 1378–79.

As to the merits of the predetermination question, we agree with the District Court's finding that the placement at Palmetto Senior High School was predetermined.  In reaching this decision, we draw on opinions from other Circuit Courts which have considered predetermination.  We do so because this Court has not yet had occasion to define the contours of predetermination.

Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team.  See Deal, 392 F.3d at 857–59.  The prohibition on predetermination arises out of an IDEA implementing regulation, which maintains that a child's placement must be "based on the child's IEP."  34 C.F.R. § 300.116(b); see also Spielberg v. Henrico Cnty. Public Schs., 853 F.2d 256, 259 (4th Cir. 1988).  As a result, the state cannot come into an IEP meeting with closed minds, having already decided material aspects of the child's educational program without parental input.  See N.L. v. Knox Cnty. Schs., 315 F.3d 688, 694–95 (6th Cir. 2003) (finding no predetermination where representatives from the school district "recognized that they were to come to the meeting with suggestions and open minds, not a required course of action"); see also Deal, 392 F.3d at 858 (finding predetermination where the state "did not have

open minds and were not willing to consider" a particular service the parents thought the child needed to benefit from his education).

This is not to say that a state may not have any pre-formed opinions about what is appropriate for a child's education. See N.L., 315 F.3d at 694. But any pre-formed opinion the state might have must not obstruct the parents' participation in the planning process. Parental "[p]articipation must be more than a mere form; it must be meaningful." Deal, 392 F.3d at 858. It is not enough that the parents are present and given an opportunity to speak at an IEP meeting. Id. ("The district court erred in assuming that merely because the Deals were present and spoke at the various IEP meetings, they were afforded adequate opportunity to participate.").

To avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parents' opinions and support for the IEP provisions they believe are necessary for their child. See id. ("Despite the protestations of the Deals, the School System never even treated a one-on-one ABA program as a viable option. Where there was no way that anything the Deals said, or any data the Deals produced, could have changed the School System's determination of appropriate services, their participation was no more than after the fact involvement."). A state can make this showing by, for example, evidence that it "was receptive and responsive at all stages" to the parents' position, even if

30

it was ultimately rejected.  Doyle v. Arlington Cnty. Sch. Bd., 806 F. Supp. 1253, 1262 (E.D. Va. 1992), aff'd 39 F.3d 1176 (4th Cir. 1994) (unpublished per curiam).  But those responses should be meaningful responses that make it clear that the state had an open mind about and actually considered the parents' points.  See N.L., 315 F.3d at 695.  This inquiry is inherently fact-intensive, but should identify those cases where parental participation is meaningful and those cases where it is a mere formality.

Here, it is clear from the transcript of the IEP meetings that the Board entered the meetings with a closed mind about where O.L. would attend school, and was unwilling to consider any other options.[7]  Cf. W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23, Missoula, Mont., 960 F.2d 1479, 1484 (9th Cir. 1992) (noting that "no alternatives to that program were considered despite the" parents' objections, based on the parent's testimony "that the district assumed a 'take it or leave it' position at the meeting"), superseded on other grounds by statute, Individuals with Disabilities Education Act Amendments of 1997, Pub. L. No. 105-17, 111 Stat. 37, as recognized in Anchorage Sch. Dist. v. M.P., 689 F.3d

---

[7] The Board urges us to disregard these transcripts.  But they are part of the administrative record, and we consider them a reliable representation of what was actually said at the IEP meetings.  After all, the Board did not take the ALJ up on the invitation to submit its own transcript into the record if it took issue with the accuracy of the transcripts proffered by the parents.

1047, 1055 (9th Cir. 2012). R.L. and S.L. were accorded no more than after-the-fact, pro-forma participation in crafting O.L.'s IEP.

During the IEP meeting, R.L. and S.L. brought up their concerns about O.L. attending Palmetto Senior High School, and suggested MAST Academy as a viable placement option for O.L. The Board responded that, for administrative reasons, O.L. could not be placed at MAST Academy and that the school was "not an option that's on the table as far as [the Board is] concerned. What our option is, is that he go to his home school." This explicit statement that the Board was considering placement only at Palmetto Senior High School, and that bureaucratic policies precluded an alternative placement, weighs strongly in favor of finding predetermination. See Deal, 392 F.3d at 855, 858–59 (finding predetermination where the state refused parents' request for a particular service where the state said that "there were certain things" it would not offer because it "could not give the same service to everybody," and that "the powers that be" would not allow the team to offer the service).

It is also clear that "there was no way that anything [R.L. and S.L.] said, or any data [they] produced, could have changed the [Board's] determination of" the appropriate placement. See Deal, 392 F.3d at 858. In an effort to justify its refusal to consider MAST Academy, the Board explained that it believed the environment at MAST Academy was very restrictive because O.L. would be isolated from all

32

other students in that program.  But this conception of the program was directly contradicted at the meeting by the representative from MAST Academy, who described the program as inclusive and accommodating.

In the face of this contradictory presentation, the Board simply reiterated that the MAST Academy placement was not available for O.L., because the special education program there had been designed for one particular student and because the parents had not gone through the formal application process to secure O.L.'s admission to that school.  After a number of interruptions in the parents' placement presentation, S.L. complained that they had "not presented to the team yet," and asked for the opportunity to do so.

Other Board representatives on the IEP team, to their credit, seemed ready to discuss whether the Board could accommodate O.L.'s needs by offering a smaller setting for O.L. within Palmetto Senior High School.  If this discussion had been allowed to continue, it might evidence some responsiveness to, and thoughtful consideration of, R.L. and S.L.'s desire to enroll O.L. in a smaller school environment.  But the Board representative running the meeting cut this conversation short, saying finally that the placement would be Palmetto Senior High School and that the parents would have to pursue mediation if they disagreed.

This absolute dismissal of the parents' views falls far short of what the IDEA demands from states charged with educating children with special needs.

33

The Board could and should have listened to the concerns R.L. and S.L. raised. Perhaps then the IEP team would have gotten to the root of the problem driving R.L. and S.L.'s desire to have O.L. placed in a smaller school—his sensitivity to his surrounding environment and his inability to handle the stress and anxiety he suffered when over-stimulated. Maybe then the team would have worked together to make sure that the IEP fully met O.L.'s sensory and stress management needs.

Instead, the Board came into the meeting set on Palmetto Senior High School and unwilling to consider anything else. As a result, the placement decision was not "based on" the IEP, 34 C.F.R. § 300.116(a)–(b), which became painfully obvious at the May 22 IEP meeting. At that meeting, after S.L. said O.L. would benefit from small inclusion classes, the Board rejected the request, saying that Palmetto Senior High School did not have any such classes and that "we're trying to create as much as we can within the limits of the school." This statement encapsulates the problem with predetermination—the Board relied on the limitations of the predetermined placement to dictate O.L.'s services. Of course, the IDEA envisions that the decision will be the other way around. See 34 C.F.R. § 300.116(a)–(b); see also 20 U.S.C. § 1401(29) (defining special education as "specially designed instruction, at no cost to parents, to meet the unique needs of a child"). On this record, the District Court properly concluded that the placement

was predetermined, and so did not err by taking that fact into account in balancing the equities.

Next, we consider the Board's argument that the District Court incorrectly determined that Palmetto Senior High School would be an inappropriate placement for O.L. under any circumstances, which factored into the District Court's balancing of the equities. Ultimately, the District Court decided that O.L.'s sensory management problems are so severe that he cannot reasonably be expected to benefit from any education in a setting as large and over-stimulatory as Palmetto Senior High School, no matter what support structures are in place. The record supports this finding.

For many children with disabilities, the educational placement is an important aspect of their IEP that will determine whether or not there is a reasonable chance they will "benefit educationally" from any instruction they receive in that placement. Rowley, 458 U.S. at 203, 102 S. Ct. at 3049 (describing FAPE standard). This is particularly true for children, like O.L., whose disabilities cause them to have particular sensitivities to their environment.[8]

---

[8] By "placement" and "environment," we mean the type of educational setting, which for O.L. was a large high school. It is important to distinguish this more general definition of the placement from the particular site selection, which is likely within the state's discretion to choose. See White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003) ("'[P]lacement' does not mean a particular school, but means a setting (such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction).").

35

There is ample evidence—certainly more than a preponderance—to support the District Court's finding that school size impacts O.L.'s ability to benefit from his education so much that an environment as large as Palmetto Senior High School would be inappropriate.  That evidence included letters from O.L.'s school psychologist, audiologist, and physical therapist describing O.L.'s sensitivities and the relationship between his symptoms and school size.  All these letters conclude that O.L. could not function in an environment as large as Palmetto Senior High School.  Even the Board's instructional supervisor for students with autism spectrum disorders testified, in response to a question about the link between the Palmetto Senior High School environment and O.L.'s severe deterioration in the first eleven days there, that "I think that's what I would envision would happen. . . . [Y]ou put him in a school, and the way kids are, and the way he is, I just see, you know, a combination of wood and fire, . . . and I don't see how anyone would not see that."

The uniform opinion among the educational experts that a large school setting would be inappropriate for O.L. was supported by both O.L.'s deterioration in the seventh grade at Palmetto Middle School and O.L.'s deterioration in the first eleven days at Palmetto Senior High School.  Cf. Sch. Bd. of Collier Cnty., Fla. v. K.C., 285 F.3d 977, 982 (11th Cir. 2002) (noting that whether positive benefits are demonstrated during the implementation of an IEP is an appropriate factor to

consider when deciding whether the IEP provided a FAPE).[9]  Based on this historical evidence and the evidence that the large school setting proved utterly unworkable for O.L., it is difficult to avoid the conclusion that the large school setting precludes O.L. from obtaining meaningful educational benefits.  For these reasons, we affirm the District Court's determination that placement in a large school setting like Palmetto Senior High School deprives O.L. a FAPE.[10]

Having concluded that the District Court correctly decided all the facts it weighed when it awarded full reimbursement, all that is left to decide is whether the District Court abused its discretion by coming out the way that it did.  See Draper, 518 F.3d at 1284.  On this record, it was well within the Court's discretion to award full reimbursement to R.L. and S.L.  As the District Court explained, the parents adequately notified the Board of their rejection of the IEP and their intent

---

[9] The Board does not think we should take O.L.'s experience in the first few days at Palmetto Senior High School into account, "because of the extremely short period of time [O.L.] was in school." K.C., 285 F.3d at 983.  But K.C. is distinguishable, because in that case there was evidence that the mother was interfering with the implementation of the IEP. See id. at 983 ("The district court found it impossible to address the academic progress component . . . because of the extremely short period of time K.C. was in school and the difficulty in determining 'what effect K.C.'s mother had on K.C.'s progress.'"); id. at 979–80 ("[H]er mother regularly attended school with her.  K.C.'s mother was generally disrespectful of K.C.'s teachers and their attempts at instruction, effectively taking over K.C.'s classroom teaching.").  Beyond that, there was no evidence in K.C. that the child had historically experienced a similar pattern of deterioration that could put the deterioration during the short implementation period into context. See generally id.

[10] The Board's attempt to hide behind the Least Restrictive Environment (LRE) "mandate"—which refers to the IDEA's provisions indicating a preference for educating the child "in the school that he or she would attend if nondisabled," 34 C.F.R. § 300.116(c)—is not persuasive.  The IDEA clearly contemplates that for some students who "require[] some other arrangement," placement in the local public school would be inappropriate. Id.

to pursue alternative placements.  The Board also complains that R.L. and S.L. prolonged the process by making numerous record requests.  But as the District Court said, there is no explanation of "how [R.L. and S.L.'s] conscientious participation somehow prevented or hindered the Board from providing an adequate IEP and FAPE."  And regarding the parents' purported refusal to consider placements outside of MAST Academy, no alternative besides the over-stimulatory Palmetto Senior High School was ever offered for the parents' consideration.  The District Court's balance of all the relevant factors in this case was thorough and, in our view, correct.  The Board has provided us with no persuasive reason to disagree with the District Court's conclusion, let alone find that it abused its discretion.

## V.  Compensatory Education

The parents' cross appeal challenges the denial of their request for compensatory education.  We review this relief-stage question only for abuse of discretion.  Draper, 518 F.3d at 1290.  Here, the District Court declined the request for compensatory education because: (1) the parents could and should have at least pursued alternative programs that would have served O.L. better than the restrictive one-on-one program, and (2) the parents did not establish a causal link between the failure to offer FAPE and the failure to progress.  The parents

primarily take issue with the fact that the District Court faulted the parents for the failure to identify a better alternative for O.L.

For two reasons, we think the quality of the alternative placement parents choose when they reject the state's offer of FAPE is a "relevant factor[]," Carter, 510 U.S. at 16, 114 S. Ct. at 366, District Courts must consider when determining what relief to grant. First, as the District Court recognized, the quality of the alternative program the parents choose has bearing on the extent of injuries suffered by a student when the state fails to offer a FAPE, and the extent to which those injuries are actually caused by that failure. This is not to suggest that the selection of an inferior program will always disrupt the causal link between the state's failure to offer a FAPE and the student's failure to progress. For example, where the parents consider alternative placements and identify a better one, but cannot secure the placement for financial or other reasons, then there is a strong argument that the failure to offer a FAPE causes the failure to progress no matter what hypothetical alternatives there might be. But here, there is no dispute that there were other alternatives available, and the record shows that the parents' first resort was a restrictive one-on-one instructional program, which even their own experts agreed was not the best placement for O.L.

Second, if the Board's failure to pursue adequate alternatives as a member of the student's IEP team is a relevant equitable factor, then surely the parents' failure

39

to do the same is, too.  The parents, as members of the IEP team, see 20 U.S.C. § 1414(d)(1)(B)(i), also have a responsibility to make sure their child is provided for in terms of his education.  When the parents reject the state's attempt to fulfill that responsibility, they take the burden of providing an education to their child upon themselves.  This being the case, the District Court can properly consider how well the parents meet that responsibility, in light of their financial circumstances, the actual availability of other alternatives, etc.

For these reasons, we find that the District Court did not abuse its discretion when it took the quality of the chosen alternative into consideration.  It is clear on this record that the District Court properly weighed the evidence and did not abuse its considerable discretion when it denied the request for compensatory education.

### VI. Attorney's Fees

Finally, we consider the Board's argument that the District Court should not have awarded R.L. and S.L. attorney's fees.  The Board makes a number of arguments in support of its position in its reply brief, but only one argument in its opening brief: that if we reversed the District Court's decision to award reimbursement, we must also reverse the decision to award attorney's fees. Because we have affirmed the District Court's decisions in all respects, there is no need to reverse the attorney's fee award.  We do not consider the other arguments the Board raises for the first time in its reply brief.  See United States v. Levy, 416

40

F.3d 1273, 1275–76 (11th Cir. 2005) (per curiam) (describing this Court's prudential rule that issues not raised in the opening brief are waived).

## VII. Conclusion

None of the arguments presented by either party persuades us that we should upset the well-reasoned orders from the District Court.  We therefore affirm the District Court's orders in all respects.

**AFFIRMED.**